Exhibit 1 — Letter of Intent

Exhibit 2 — "Montgomery Purchase Agreement"

Exhibit 3 — "Montgomery Cancellation Agreement"

Exhibit 4 — "O'Farrell Purchase Agreement"

Exhibit 5 — "O'Farrell Cancellation Agreement"

Exhibit 6 — "Geary Purchase Agreement"

Exhibit 7 — "Guo/Huang Family Trust Promissory Note"

Exhibit 8 — "HK Grace Operating Agreement"

Exhibit 9 — "HK Grace Amended Operating Agreement"

Exhibit 10 — the amendment to the promissory note on June 21, 2012

Exhibit 11 — second amendment on July 21, 2013

Exhibit 12 — "2010 Distressed Property Portfolio Investment Agreement"

Exhibit 13 — "2013 Distressed Property Portfolio Investment Agreement"

# EXHIBIT 1

## Letter of Intent

**Date:** ____November 23, 2009__

The purpose of this letter is to express our intent to purchase Non-performing mortgage loan ("NPN") loan in which __Wei Huang__ ("Buyer") would be willing to make an offer on a . The terms, including purchase price and amount of earnest money deposit are set forth below:

**Property Address: 722-728 Montgomery Street, San Francisco, CA 94104**

**Purchase Price Offered:  $2,500,000.00 (equal to 1/3 of total value of NPN)**

**Terms: Cash**

**Earnest Money Deposit: 1,000,000.00**

Buyer intends to enter into a purchase and sale agreement immediately. The agreement would incorporate the terms set forth herein, together with such terms as may be agreed to by all parties.

This letter is intended as a non-binding expression of interest on the part of the Buyer to purchase the properties and not as purchase offer, which if accepted, would create a legally binding agreement.

If these terms set forth herein form an acceptable basis upon which you would sell the properties, and you would like to move forward to negotiate a purchase contract, please so indicate by signing below.

**If these terms and conditions are acceptable, please notify us immediately, so we may submit a binding purchase agreement.**

_____

Buyer's Signature

_____

Buyer's Signature

Liberty Asset Management Corporation

By_____

Authorized Signature

# EXHIBIT 2



# LIBERTY ASSET MANAGEMENT CORPORATION

480 San Antonio Road, Suite 210, Mountain View, CA 94040
Phone: (650) 559-8811     Fax: (650) 641-2982

## SALE AGREEMENT OF NOTE SECURED BY DEED OF TRUST

This Agreement is entered into on this ___23__ day of ___November_____ 2009 by and between *Liberty Asset Management Corporation* (hereinafter referred to as "Seller") and _____Wei Huang_____(hereinafter referred to as "Buyer") with reference to the following facts.

      A)     Seller entered into a Master Mortgage Loan Sale Agreement with A financial institution wherein the Seller is purchasing a package of Non-performing mortgage loans.

      B)     Buyer is interested in purchasing from Seller, the loan evidenced by a Note (hereinafter "Note) secured by a Deed of Trust recorded in 1st lien position against the real property listed in Exhibit-A.

These properties hereinafter referred to as "Property".

## SELLER'S DISCLOSURES

Buyer understands that the Note is presently in default and for the Buyer to recover his/her/their investment and profit, if any, the completion of a foreclosure may be necessary.

Seller has advised Buyer that the Property cannot be inspected on the interior and that the physical condition and/or state of repairs needed in such Property cannot be determined. Buyer has been advised that the Property may have illegal additions which may not be to city or governmental code and/ or the Property may have undisclosed environmental conditions. When purchasing the Note, Buyer is taking into account that the Property by which the Note is secured will be in "As Is" condition with "All Faults" and may require extensive repairs.

Seller makes no warranty or representation, express or implied, or arising by operation of law, including, but not limited to, any warranty of condition, habitability, merchantability, or fitness for a particular purpose of the Property or any portion thereof or with respect to environmental or physical condition of the Property.

Seller has advised the Buyer that the foreclosure process may be slowed by the borrower under the Note filing Bankruptcy and/or future governmental actions affecting foreclosures. Further, the Buyer understands that the borrower, residing in the Property, may have to be evicted from the Property, which will further increase the time and expenses before the Buyer can realize his investment in the Note.

Seller has advised the Buyer that all delinquent property taxes will be paid current at the time of the sale.

1

 **LIBERTY ASSET MANAGEMENT CORPORATION**
480 San Antonio Road. Suite 210, Mountain View, CA 94040
Phone: (650) 559-8811   Fax: (650) 641-2982

Seller has advised the Buyer to have this Agreement and all of the underlying documentation reviewed by his/her/their Attorney and/or real estate expert.

## REPRESENTATIONS AND ACKNOWLEDGMENT BY BUYER

Buyer has advised Seller that he/she/they  are sophisticated investor(s) and the decision to purchase the Note is based on his/her/their own expert evaluation of the mortgage file and other materials made available by Seller pertaining to the Note and Property.  Buyer has not relied, for entering into this agreement,  upon any oral or written information from Seller or Seller's employees, affiliates or agents, other than the representations and warranties of the Seller contained herein.

Buyer has had an opportunity to conduct a due diligence review and  an analysis of the due diligence materials (including, but not limited to the loan documents, the mortgage file and related information), together with such records as are generally available to the public from local, County, State and Federal authorities, record keeping offices and Courts (including without limitation any Bankruptcy Courts) as the Buyer deems necessary, proper and appropriate in order to make a complete and informed decision with respect to the purchase  of the Note.

*NOW THEREFORE,*  in consideration of the above Recitals and the Promises set forth below, the Parties agree as follows:

1.      Upon execution of this Agreement, Buyer shall deliver to Seller the sum of $ 2,500,000.00          .

2.      Upon execution of this Agreement and the depositing of funds described above, Seller shall deliver to Buyer, a Policy of Title Insurance and copies of the Promissory Note and, Deed of Trust.  Seller shall execute and record an Assignment of the Deed of Trust as soon as Seller receives the necessary original paperwork from a financial institution.  If Seller is unable to record an Assignment and deliver the original documents to Buyer within 30 Days, Seller shall refund the entire payment made by Buyer to Seller to Buyer.

3.      Seller shall be responsible for all costs associated with the sale of the Promissory Note up to the date of recording the Assignment of Deed of Trust to Buyer.  Any costs thereafter, including but not limited to foreclosure fees, servicing fees, Attorney's fees, etc., shall be born by the Buyer.

4.      Buyer and Seller agree that Seller is selling and Buyer is buying a Note and not a debt instrument of Seller or any other security.  Accordingly, each Party intends to treat this transaction, for Federal income tax purposes, and each transaction shall be reflected in Seller's books and records, tax returns, balance sheets and other financial statements as a sale by Seller, and a purchase by Buyer.

2

 **LIBERTY ASSET MANAGEMENT CORPORATION**

480 San Antonio Road, Suite 210, Mountain View, CA 94040
Phone: (650) 559-8811    Fax: (650) 641-2982

5.     Buyer and Seller agree to execute and deliver such documents and take such action as the other party may, from time to time, reasonably request, to effect the purpose and carry out the terms of this Agreement.

6.     This Agreement shall inure to the benefit of and be binding upon Buyer and Seller and the respective successors and assigns of Buyer and Seller.

7.     Neither this Agreement, nor any provision thereof maybe changed, waived, discharged or terminated orally, but only by a written instrument signed by both Buyer and Seller.

8.     For the purposes of facilitating the execution of this Agreement, and for other purposes, this Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be original, and all such counterparts shall constitute one and the same instrument.

9.     This Agreement shall be interpreted under the laws of the State of California.

DATED: _11 - 2 4 - 0 9_

Liberty Asset Management Corporation
By: _____

DATED: _11 / 24 / 2009_

**Buyer**
Wei Huang

3



# LIBERTY ASSET MANAGEMENT CORPORATION

480 San Antonio Road, Suite 210, Mountain View, CA 94040

Phone: (650) 559-8811      Fax: (650) 641-2982

**Exhibit-A**

<u>Subject Property</u>

| 1 | 722-728 Montgomery Street, San Francisco, CA 94104 | $2,500,000.00 |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# Buyer Property Purchase Request Form

**Buyer's Name:** _____Wei Huang_____

_____

**SSN:** ▮▮▮▮▮▮_____    **D.O.B.:** ▮▮▮▮▮▮___    **C.D.L.:** ▮▮▮▮▮▮____

## Received Checks/Wires

| Check Method | Amount | Reference No. |
|---|---|---|
| ____ Check   X  Wire | $1,000,000.00 | Nov. 25, 2009 |
| ____ Check   X  Wire | $1,500,000.00 | |
| ____ Check ____ Wire | | |
| ____ Check ____ Wire | | |

**Total Amount Received:** $ _2,500,000.00_____

| Property Address | Purchase Price | Apply Amount |
|---|---|---|
| 722-728 Montgomery Street, San Francisco, CA 94104 | $2,500,000.00 | $2,500,000.00 |
| | | |
| | | |
| | | |
| | | |

**Title Will Be Held As:** _____Wei Huang_____

**Agent Name:** __Sonia M Chiou_____    **Date:** _November 23, 2009____

# EXHIBIT 3



# LIBERTY ASSET MANAGEMENT CORPORATION

## CANCELLATION OF REAL ESTATE OWNED/ NON-PERFORMING NOTES PURCHASE AND SALE AGREEMENT AND RELEASE OF DEPOSIT

Between

**Liberty Asset Management Corporation**
**("*Seller*")**

and

**Wei Huang** **LLC**
**("*Purchaser*")**

Effective
**August 16, 2010**



# LIBERTY ASSET MANAGEMENT CORPORATION

## CANCELLATION OF REAL ESTATE OWNED/NON-PERFORMING NOTES PURCHASE AND SALE AGREEMENT AND RELEASE OF DEPOSIT

This Cancellation of Real Estate Owned/Non-Performing Notes Purchase and Sale Agreement and Release of Deposit ("**Cancellation**") is made and entered into as of 16ᵗʰ day of August 2010 ("**Effective Date**"), by and between Liberty Asset Management Corporation and its respective parent or subsidiary companies and affiliates, ("**Seller**"), a California Corporation whose principal place of business is located at 554 San Antonio Rd, Mountain View, CA 94040, and Wei Huang ("**Purchaser**") whose name, phone number and address are listed below

### PURCHASER:

Name: __Wei Huang_____

Title: _____

Phone: _____

Address:_____

**WITNESSETH:**

**WHEREAS,**

1. Seller and Purchaser entered into the Real Estate Owned/Non-Performing Notes Purchase and Sale Agreement with an effective date of 16ᵗʰ day of August 20 11 ("**Agreement**");
2. Seller and Purchaser acknowledge that the Agreement and any other addenda, amendments and related documents shall together be referred to as the "**Agreement**");
3. Seller and Purchaser agree that the Agreement on the property, 722-728 Montgomery Street, San Francisco, CA 94104, to the Agreement is cancelled and terminated at the request of __both Purchaser and Seller___.

**NOW THEREFORE**, the parties hereto hereby agree as follows:

## 1. CANCELLATION OF AGREEMENT

1.1 **Cancellation of Agreement**. Seller and Purchaser agree that the Agreement is hereby cancelled and terminated at the request of __both Purchaser and Seller___.

## 2. RELEASE OF DEPOSIT

2.1 Seller and Purchaser hereby acknowledge that Purchaser's deposit in connection with the Agreement shall be fully refunded to Purchaser.

2.2 The Purchaser's deposit shall be refunded to:

    2.2.2 __Wei Huang_____
            _____
            _____

2.3 Purchaser shall return to Seller the attached Acknowledgment of Receipt of Deposit within 2 (two) business days of receipt of the deposit. Failure to return the Acknowledgement of Receipt of Deposit will void this Cancellation.

## 3. MUTUAL RELEASE

3.1 Purchaser and Seller mutually release each other from all obligation to buy, sell or exchange the property(ies)contained in Exhibit "1" to the Agreement, and from all claims, actions, and demands that each may have against the other(s) by reason of the Agreement.

3.2 Purchaser and Seller intend that all rights and obligations arising out of the Agreement are null and void upon Seller's receipt of Purchaser's Acknowledgement of Receipt of Deposit.

**IN WITNESS WHEREOF**, each of the undersigned parties to this Agreement has caused this Agreement to be duly executed by one of its duly authorized officers or members, all as of the date first written above.

**SELLER**
Liberty Asset Management Corporation

_____  08-16-10
Asset Manager        Date

**PURCHASER**
Wei Huang

_____  8/16/2010
              Date

# EXHIBIT 4



# LIBERTY ASSET MANAGEMENT CORPORATION

### REAL ESTATE OWNED
### PURCHASE AND SALE AGREEMENT

Between

**Liberty Asset Management Corporation**
(*"Seller"*)

and

**JD Brothers LLC**
(*"Purchaser"*)

Effective
**August 16, 2010**



# LIBERTY ASSET MANAGEMENT CORPORATION

### REAL ESTATE OWNED
### PURCHASE AND SALE AGREEMENT

This Real Estate Owned/Non-Performing Note Purchase and Sale Agreement ("Agreement") is executed on this 16th day of August, 2010 by and between Liberty Asset Management Corporation and its respective parent or subsidiary companies and affiliates, ("Seller"), a California Corporation whose principal place of business is located at 3218 E. Holt Avenue #212, West Covina, CA 91791, and JD Brothers LLC ("Purchaser") whose name, phone number and address are listed below.

### JD Brothers LLC ("PURCHASER"):

Name: __Jimmy Guo__

Title: __Operating Manager__

Phone: __(650) 558-9621__

Address: __544 San Antonio Road, Mountain View, CA  94040__

**WITNESSETH:**

**WHEREAS,**

1. Seller is the Owner or agent of the Owner of each Real Estate Owned/Non-Performing Note ("REO/NPN") Property as identified in Schedule 1 ("Assets" and each an "Asset").

2. Seller and/or Owner desires to sell and Purchaser desires to purchase Seller's and/or Owner's right, title and interest in and to each of the REO/NPN identified on the attached REO/NPN Schedule.

3. Purchaser acknowledges that Seller is selling only 70% ownership interest of the attached REO/NPN Schedule.

**NOW THEREFORE**, the parties hereto hereby agree as follows:

1. **PURCHASE AND SALE OF REO**

    1.1 **Purchase and Sale of REO**. Seller and/or Owner hereby agrees to sell, assign, transfer, convey and deliver to Purchaser, and Purchaser hereby agrees to purchase from Seller and/or Owner, all of Seller's and/or Owner's right, title and interest in and to the REO/NPN properties listed in Schedule 1.

    1.1.1 **"REO"** shall mean Real Estate Owned Property and shall include each real property identified in Schedule 1, including any permanently affixed buildings and fixtures thereon and all accessions thereto (including installations of mechanical, electrical, plumbing, heating and air conditioning systems located in and affixed to such buildings), and all additions, alterations and replacements thereto.

    1.2 **Purchase Price**. The individual purchase price for each REO/NPN property ("Asset Purchase Price") is set forth in the attached Schedule 1.

    1.2.1 **"Asset Purchase Price"** shall mean the individual purchase price for each REO/NPN as set forth in the attached Schedule 1. The individual purchase price is the amount of the Purchaser's accepted offer.

    1.2.2 **"Gross Aggregate Purchase Price"** for the sale and/or transfer of all of the REO/NPN Properties shall mean the sum of the Asset Purchase Prices for all REO/NPN properties identified in Schedule 1.

    1.3 **Payment**. The Gross Aggregate Principal Purchase Price for all REO/NPN properties listed in Schedule 1 is due and shall be paid upon execution of this Agreement and no later than August 17, 2010. All payments shall be made by wire transfer in immediately available United States funds as directed by Seller.

## 2.   GENERAL REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER

Seller represents and warrants to Purchaser as of the date of execution of this Agreement:

2.1   **Due Formation and Good Standing.**  Seller is duly organized, validly existing and in good standing under the laws of its state of organization.

2.2   **Authority and Capacity.**  Seller has all requisite power, authority and capacity to enter into this Agreement and to perform its obligations hereunder.  Seller has the right to sell its interest in each individual REO/NPN property.

   2.2.1   The execution and delivery of this Agreement, and any related agreements or instruments and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary corporate action.

   2.2.2   This Agreement is the binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, receivership, conservatorship, reorganization, fraudulent conveyance or other similar laws relating to or affecting creditor's rights generally and moratorium laws from time to time in effect, and by equitable principles restricting availability of equitable remedies.

2.3   **Statements Made.**  No representation, warranty or written statement made by Seller in this Agreement, or in any schedule or exhibit attached hereto, contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading.

   2.3.1   Any written broker price opinion obtained by Seller and subsequently made available to Purchaser has not been altered by Seller from what was received.  Notwithstanding the preceding sentence, Seller makes no representation or warranty of any kind as to the validity or accuracy of any such broker price opinion furnished by Seller to Purchaser.

## 3.   SPECIFIC REPRESENTATIONS AND WARRANTIES AS TO THE REO/NPN PROPERTIES IN SCHEDULE 1

With respect to each REO property contained in Schedule 1, Seller represents and warrants to Purchaser as of the date of execution of this Agreement:

3.1   **Liens and Encumbrances.**  Purchaser is aware that since these are foreclosed and/or properties in the process of foreclosure, there may be liens or other encumbrances still existing on a given property.  While Seller is not aware of any liens at this time, there may or may not be delinquent property taxes on the some or all of the REO properties listed in Schedule 1.

3.2   **Title.**  As of the date of execution of this Agreement, the REO properties listed in Schedule 1, have not been assigned or pledged by Seller to another Purchaser and Seller is either the agent of the Owner who has title or Seller is the owner of record of the REO property(ies) listed in Schedule 1 and has good and marketable title thereto, free and clear of any and all liens or encumbrances (except as otherwise set forth in Section 3.1), and any and all equities, participation interests, claims, pledges, charges, or security interests of any nature, subject to no interest or participation of, agreement with, or approval of any other party, to sell, assign and transfer the same pursuant to this Agreement.

3.3   **REO/NPN Schedule.**  The information set forth in Schedule 1 with respect to the REO property is true and correct in all material respects.

   3.3.1   **"REO Schedule"** shall mean the schedule of REO property attached hereto as Schedule "1", such schedule setting forth the following information with respect to each REO/NPN Property: (a) the street address of the REO/NPN property including the city, state and zip code; (b) the Asset Purchase Price; and (c) the Gross Aggregate Purchase Price;

3.4   **Occupancy.**  Seller shall transfer Owner's right, title and interest in and to the REO property purchased upon execution of this Agreement.  However, possession of the REO property may not be delivered to Purchaser on the date of execution of this Agreement, and Seller makes no representations or warranties as to the occupancy status of any REO property as of said date.

3.5   **Location of Improvements.**  Except as set forth in data or files made available to Purchaser by Seller prior to the date of execution of this Agreement, or identified in an opinion of value (including, but not limited to, a broker price opinion or appraisal) or other data obtained or gathered by or otherwise available to Purchaser prior to the date of execution of this Agreement through its own due diligence, to Seller's actual knowledge, no improvement located on the REO property lies outside the boundaries and building restriction lines of such real property; no improvements on an adjoining property encroach upon the REO property; and no REO property or any improvement(s) that is located thereon is in violation of any applicable laws, including zoning and building laws and ordinances.

3.5.1   Except as may be set forth in data or in files made available to Purchaser by Seller prior to the date of execution of this Agreement, or identified in an opinion of value (including, but not limited to, a broker price opinion or appraisal) or other data obtained or gathered by or otherwise available to Purchaser prior to date of execution of this Agreement through its own due diligence, to Seller's actual knowledge, each REO is properly zoned for its intended use as a commercial property.

3.6   **Code Violation Notices.**  Seller has notified Purchaser of current code violation notices in its possession relating to the REO/NPN property(ies) and shall forward same to Purchaser for thirty (30) days following the date of execution of this Agreement.

3.7   **Complete Property Destruction.**  Purchaser is aware that since these are foreclosed and/or properties in the process of foreclosure, there may be complete property destruction, gutted homes or extensive fire damage existing on any or all of the REO/NPN property(ies) listed in Schedule 1.

## 4.   GENERAL REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as of the date of execution of this Agreement:

4.1   **Due Formation and Good Standing.**  Purchaser is duly organized, validly existing and in good standing under the laws of its state of organization.

4.2   **Authority and Capacity.**  Purchaser has all requisite power, authority, and capacity to enter into this Agreement and to perform its obligations hereunder.

4.2.1   The execution and delivery of this Agreement and any related agreements or instruments and the consummation of the transactions contemplated hereby and thereby, each has been duly and validly authorized by all necessary company action.

4.2.2   This Agreement is the binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, receivership, conservatorship, reorganization, fraudulent conveyance or other similar laws relating to or affecting creditor's rights generally and moratorium laws from time to time in effect, and by equitable principles restricting availability of equitable remedies.

4.3   **No Conflict.**  No part of this Agreement or execution and delivery of this Agreement or the consummation of the transaction(s) contemplated hereby or compliance with its terms and conditions, conflicts with, results in the breach of or constitutes a default under, is prohibited by, or requires any additional approval under any of the terms, conditions or provisions of the Purchaser's articles of organization or operating agreement, or any other agreement or instrument to which Purchaser is now a party or by which it is bound, or of any order, judgment or decree of any court or governmental authority applicable to the Purchaser.

4.4   **Statements Made.**  No representation, warranty or written statement made by the Purchaser in this Agreement, or in any schedule, exhibit, report, written statement or certificate furnished to Seller by Purchaser in connection with the transactions contemplated hereby, contains, or will contain, any untrue statement of a material fact or omits or will omit, to state a material fact necessary to make the statements contained herein or therein not misleading.

4.5   **Evictions; Security Deposits; Personal Property.**  Purchaser acknowledges, understands and agrees that it is responsible for any eviction actions necessary to obtain possession of an REO property(ies) listed in Schedule 1, all in accordance with applicable law.  Seller has no knowledge of any leases or any security deposits related to any REO property(ies) and thus none will be transferred to Purchaser on the date of execution of this Agreement.

4.5.1   Purchaser further acknowledges, understands and agrees that it is responsible to any occupants for the return of the security deposit, if any, related to an REO property(ies), and for the property handling of any personal property located at or in an REO property(ies), all in accordance with applicable law.

4.6   **Decision to Purchase.**  Except as otherwise expressly set forth in this Agreement, neither Seller nor its parent, directors, officers, employees, agents, representatives, attorneys or contractors (collectively, "**Seller Parties**") have made any guarantees, promises, statements, assurances or warranties, express or implied, to Purchaser including without limitation, any pertaining to the suitability of the REO property(ies) contained in Schedule 1 for any purpose, the profitability of owning or operating the REO property(ies), the physical or environmental condition thereof, the suitability, habitability or merchantability or fitness of the REO property(ies) for Purchaser's intended use or for any use whatsoever, the rentals, income or expenses thereof, the net or gross acreage contained therein, the zoning thereof, the existence or satisfaction of any local, state or federal approvals or permits for the development or use thereof, the availability or existence of water, sewer or other utilities, the existence or nonexistence of any hazardous substances or materials in, on or under the REO property(ies), or as to any other past, present or future matter whatsoever.

4.6.1   Purchaser acknowledges and agrees that the REO property(ies) and the date and files made available to it, together with Purchaser's ability to perform its own due diligence on the REO, were an adequate and sufficient basis on which to determine whether to purchase the REO property(ies) listed in Schedule 1 and to base Purchaser's bid.  Purchaser has made such independent investigations and engaged in such other due diligence as it deems to be warranted into the nature, validity, enforceability, collectability and value of the REO property(ies), and all other facts Purchaser deems material to its bid for and its purchase of the REO property(ies) listed in Schedule 1, and Purchaser is entering into this transaction solely on the basis of that investigation and Purchaser's own judgment.

4.6.2   Purchaser acknowledges and agrees that it has satisfied itself regarding the condition of the REO property(ies), and that the REO property(ies) contained in Schedule 1 will be purchased **"AS IS AND WITH ALL FAULTS."**  Purchaser shall assume the responsibility and risk of all defects to and conditions of the REO/NPN property(ies) listed in Schedule 1, including such defects and conditions, if any, which cannot be observed by casual inspection.  Seller and Purchaser acknowledge and agree that this disclaimer has been specifically negotiated, and that the REO property(ies) contained in Schedule 1 will be sold it its then-present condition.

4.6.3   Except to the extent of any express representations contained in this Agreement, Purchaser hereby releases the Seller Parties from any and all amounts, actions, demands, claims, costs, expenses, damages and liabilities (including, without limitation, attorney's fees and costs) (collectively, the **"Liabilities"**) relating to or arising from the condition or status of, or any other matter in any way pertaining to, the REO property(ies) listed in Schedule 1.  Purchaser acknowledges and agrees that the release and discharge given by it hereunder to the Seller Parties extends to all such Liabilities described above, whether known or unknown, foreseen or unforeseen, patent or latent, which Purchaser may at any time have against the Seller Parties.

4.6.4   All the provisions of Section 4 shall survive the execution and delivery of any Deed delivered hereunder and the closing of the contemplated hereby.

## 5.  TRANSFER OF INTEREST

5.1.   **Delivery of Seller Documents and Other Items**.  On the date of the execution of this Agreement, or as soon as practical thereafter, Seller (or its designee) shall execute and deliver to Purchaser the following (collectively, **"Seller's Closing Documents"**):

5.1.1   A Quit Claim Deed or similar deed (**"Deed"**), or beneficial ownership in a Land Trust or such other documents evidencing transfer of ownership of the properties between the Seller and Purchaser

5.1.2   An Assignment of Deed of Trust evidencing transfer of beneficial interest to the Deed of Trust including but not limited to: (a) Policy of Title Insurance; (b) Copy of Promissory Note(s); (c) Copy of Deed of Trust(s).

5.1.2   Such other documents as are customary and appropriate under local laws for recording in the land records in the jurisdiction in which the REO/NPN property(ies) is(are) located; and

5.1.3   Keys for those REO property(ies) where keys are actually in Seller's possession.

5.2   **Delivery of Purchaser Documents and Other Items**.  On the date of execution of this Agreement, Purchaser will execute and/or deliver to Seller or to other applicable parties as instructed by Seller, the following (collectively, **"Purchaser's Closing Documents"**):

5.2.1   The Purchase Price in accordance with Section 2 of this Agreement.

5.2.2   Such Affidavits of Purchaser or other documents, if any, as may reasonably be required by the closing agent to record Seller's Closing Documents.

5.2.3   A signed and executed Resale Agreement.

5.3   **Further Assurances**.  Seller and Purchaser each agree to take, or cause to be taken, such acts, including execution and delivery of additional documents, instruments and agreements, as may be reasonably necessary or desirable to carry out the purposes of this Agreement and to consummate the transaction contemplated hereby.

5.3.1   Seller is responsible for depositing and recording the Deeds for recording in their respective counties as soon as practicable following the date of execution of this Agreement, but no later than ninety (90) calendar days after said date. 70% of costs including but not limited to Owner's Title Insurance Policy, Recording Fees, County and City Transfer Tax, etc. shall be borne by the Purchaser.

5.3.2    Seller shall be responsible for all costs associated with the sale of the REO property(ies) up to the date of the recording of the Assignment of the Deed of Trust to Buyer. 70% of costs thereafter including but not limited to foreclosure fees, servicing fees, attorney's fees, etc., shall be borne by the Purchaser.

5.3.3    If Seller is unable to record a Deed or an Assignment of the Deed of Trust and deliver to Purchaser within ninety (90) calendar days, Seller offers the Purchaser the option of (a) receiving a replacement property of the same or similar characteristics in lieu of the objectionable property or (b) receiving a refund in the purchase price attributable to said property.

## 6.   REMEDIES

6.1    **Indemnification by Seller**.  Seller shall indemnify and hold Purchaser and its officers, directors, employees and agents harmless from and against, and will reimburse it or them for, any and all third-party losses, damages, deficiencies, claims, costs or expenses, including reasonable attorney's fees and will defend it or them against any third-party claim, demand or litigation arising out of, in connection with or to the extent resulting from:

6.1.1    Any misrepresentation made by Seller, or in any schedule or exhibit attached hereto, which misrepresentation materially and adversely affects the value of an REO property(ies) or materially and adversely affects the interest of the Purchaser in an REO property(ies); or

6.1.2    The non-fulfillment or non-performance of any covenant, condition or action required of Seller pursuant to this Agreement.

6.2    **Limitation of Remedies Regarding Property-Related Expenses**.  Purchaser acknowledges and agrees that the Purchase Price does not represent full and final settlement of delinquent property taxes or other assessments, homeowner's association dues, special assessments, utilities or other property-related expenses as set forth elsewhere herein.

6.3    **Indemnification by Purchaser**.  Purchaser shall indemnify and hold Seller, its shareholders and affiliates and their respective officers, directors, employees and agents, harmless from and against, and must reimburse it or them for, any and all third-party losses, damages, deficiencies, claims, costs or expenses, including reasonable attorney's fees, and defend it or them against any third-party claim, demand, or litigation arising out of, in connection with or to the extent resulting from:

6.3.1    Any misrepresentation made by Purchaser, or any breach of warranty by Purchaser, contained in this Agreement, or in any schedule, exhibit, report, written statement or certificate furnished by Purchaser pursuant to this Agreement, which misrepresentation or breach of warranty materially and adversely affects the interest of Seller; or

6.3.2    The non-fulfillment or non-performance of any covenant, condition or action required of Purchaser pursuant to this Agreement.

## 7.   CONFIDENTIALITY

7.1    Seller and Purchaser agree that all information and recommendations provided to the other shall be treated as confidential ("Confidential Information").

7.2    Seller and Purchaser agree that no Confidential Information will be disclosed without prior consent of the other party unless:

7.2.1    Required by law, Court Order or agency directive, or

7.2.2    Unless Seller or Purchaser expects, in its reasonable opinion, that Seller or Purchaser will be compelled by a court or government agency, to make such disclosure or unless such Confidential Information becomes publicly available or known other than as a result of actions of Seller or Purchaser.  In the event Seller or Purchaser is compelled to disclose confidential information by legal process, Seller or Purchaser will use its best efforts to give written notice to the other party prior to such disclosure.

7.2    The provisions of Section 7 shall survive the date of execution of this Agreement.

## 8.   FORCE MAJEURE

8.1    If either Seller or Purchaser fails to perform in whole or in part its duties under this Agreement due to an event of force majeure, the performance of such duties shall be suspended during the period of such event of force majeure.

8.2    The party affected by an event of force majeure shall not be in breach of this Agreement if there is any loss or damage, and shall not be liable or responsible for any loss or damage incurred by the other party as a

result of any total or partial failure, interruption or delay in performance of its duties and obligations occasioned by an event of force majeure.

8.3 A party that claims that it has been affected by an event of force majeure shall notify the other party of such event of force majeure in writing in the shortest period possible, and shall provide appropriate evidence of the existence and period of the event of force majeure to the other party within fifteen (15) calendar days after its occurrence. A party that claims that the performance of this Agreement is objectively impossible and impractical due to such event of force majeure shall take any reasonable measures to lessen the losses caused by such event of force majeure.

8.4 When the event of force majeure occurs, the parties shall consult with each other regarding the performance of this Agreement. Once the event of force majeure or its effects ceases, both parties shall immediately resume the performance of their respective obligations.

8.5 An event of force majeure refers to any circumstances that cannot be reasonably controlled, predicted, avoided or overcome, and occurs after execution of this Agreement, which make the performance of this Agreement in whole or in part impossible or impracticable as a matter fact, including but not limited to any situation where performance is impossible without unreasonable expenditure. Such circumstances include but are not limited to floods, fires, droughts, typhoons, earthquakes, and other acts of God, traffic accidents, strikes, riots, turmoil and wars (declared or not) and any act or omission of a governmental authority beyond the control of either party.

## 9. MISCELLANEOUS

9.1 **Survival**. The representations, warranties, covenants and agreements contained in this Agreement with respect to each REO property(ies) shall survive the date of execution of this Agreement, for that REO property(ies) for a period of forty-five (45) calendar days following the date of execution of this Agreement.

9.1.1 The representations and warranties of the Seller in this Agreement are unaffected by and supersede any provision in any endorsement of any REO property(ies) or in any Deed or assignment with respect to such REO property(ies) to the effect that such endorsement or Deed or assignment is without recourse or without representation or warranty.

9.1.2 The provisions of Section 4, Section 6 and Section 7 shall survive the date of execution of this Agreement.

9.2 **Amendment**. This Agreement may not be changed or amended except by an instrument in writing signed on behalf of each of the parties hereto.

9.3 **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall be considered one and the same instrument.

9.4 **Entire Agreement**. This Agreement contains the entire understanding of the parties and supersedes all prior agreements, arrangements and understandings relating to the subject matter thereof. There are no written or oral agreements, understanding, representations or warranties between the parties other than those set forth herein. No representations were made or relied upon by either party except for as set forth.

9.5 **Assignment**. This Agreement is not assignable unless all parties to this Agreement agree by an instrument in writing signed on behalf of each of the parties hereto.

9.6 **Non-Waiver**. Failure of either party to object to or take other action with respect to any conduct of the other party that may be a breach of this Agreement shall be deemed a waiver of any breach or of any future breach of wrongful conduct.

9.7 **Severability**. If any provision of this Agreement or its application to any person or entity or circumstance is found by a court of competent jurisdiction to be invalid, illegal, or unenforceable, such provision will be construed and enforced as if it had been more narrowly drawn so as not to be invalid, illegal, or unenforceable. The remainder of this Agreement or its application to other persons or circumstances shall not be affected and shall remain in full force and effect and will not in any way be affected or impaired thereby.

9.8 **Rights Cumulative; Waiver**. The rights of each of the parties under this Agreement are cumulative, may be exercised as often as any party considers appropriate and are in addition to each such party's rights under any other documents executed between the parties or, except as otherwise modified herein, under law.

9.8.1 The rights of each of the parties hereunder shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing. Any failure to exercise or any delay in exercising any such rights shall not preclude any other or further exercise of that or any other such right.

9.8.2 No act or course of conduct or negotiation on the part of any party shall in any way preclude such party from exercising any such right or constitute a suspension or any variation of such right.

9.9 **Notices**. All notices and other communications under this Agreement must be in writing (including a writing delivered by electronic transmission) and are deemed to have been duly given if: (a) when delivered, it is sent by registered or certified mail (return receipt requested); (b) when delivered, it is delivered personally or by facsimile or email (if followed by a copy of the same being delivered to the other party by first class mail or reputable overnight courier); or (c) on the first following business day, if sent by United States Express Mail or other reputable overnight courier, in each case to the parties at the addresses set forth in Section 9.1.1 or at such other addresses as shall be specified by like notice.

9.1.1   Notices shall be sent to the following addresses

LAMC
Attn: Anne Cho
3218 E. Holt Avenue #212
West Covina, CA 91791
Phone Number: (626) 214-2154
Fax: (626) 214-2153

JD Brothers LLC
Attn:  Jimmy Guo
544 San Antonio Road
Mountain View, CA  94040
Phone Number: (650) 558-9621
Fax: _____

9.10 **Governing Law**. The validity, interpretation, and performance of this Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of California.

9.11 **Waiver of Jury Trial**. **EACH OF THE PARTIES HERETO WAIVES ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTION(S) CONTEMPLATED HEREBY OR THEREBY IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST THE OTHER PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE.  EACH OF THE PARTIES HERETO AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY.  WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS PARAGRAPH AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF OR THEREOF.  THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.**

9.12 **Attorney's Fees**. If either party becomes involved in litigation (including bankruptcy proceedings) or other proceedings arising out of or relating to this Agreement, the court will award legal expenses (including reasonable attorney's fees, court costs and other legal expenses) to the prevailing party.  The award for legal expenses will not be computed in accordance with any court schedule, but will be as necessary to fully reimburse all reasonable attorney's fees and other legal expenses paid or incurred in good faith, regardless of the size of the judgment or award, it being the intention of the parties to fully compensate for all the reasonable attorney's fees and other legal expenses paid or incurred in good faith.

9.12.1   For the purpose of this Agreement, the terms **"attorney's fees"** or **"attorney's fees and costs"** mean the fees and expenses of counsel, printing, duplicating and other expenses, air freight charges, and fees billed for law clerks, paralegals, librarians and other not admitted to the bar but performing services under the supervision of any attorney.

9.12.2   The terms **"attorney's fees"** or **"attorney's fees and costs"** also include all reasonable fees and expenses incurred with respect to appeals, bankruptcy and other proceedings, and whether or not any action or proceeding is brought with respect to the matter for which said fees and expenses were incurred.

9.13 **Successors and Assigns**. This Agreement is binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and their respective permitted successors and assigns.

9.14 **Time is of the Essence**. The parties to this Agreement acknowledge and understand that time is of the essence.

**IN WITNESS WHEREOF**, each of the undersigned parties to this Agreement has caused this Agreement to be duly executed by one of its duly authorized officers or members, all as of the date first written above.

**SELLER**
Liberty Asset Management Corporation

_____     _____     08-16-10
Asset Manager               Date

_____     _____
Portfolio Operation Manager  Date

**PURCHASER**
JD Brothers LLC

_____     _____     8/16/2010
Title                       Date

_____     _____
Title                       Date

_____     _____
Title                       Date

_____     _____
Title                       Date

SCHEDULE 1

REO/NPN PROPERTY(IES)

| Address | City | State | Zip | 70% of Asset Purchase Price |
|---|---|---|---|---|
| 165 O'Farrell Street | San Francisco | CA | 94102 | $4,760,000.00 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Gross Aggregate Purchase Price for 70% Ownership Interest  $4,760,000.00**

# EXHIBIT 5





# LIBERTY ASSET MANAGEMENT CORPORATION

## CANCELLATION OF REAL ESTATE OWNED/ NON-PERFORMING NOTES PURCHASE AND SALE AGREEMENT AND RELEASE OF DEPOSIT

Between

**Liberty Asset Management Corporation**
("*Seller*")

and

**JD BROTHERS** LLC
("*Purchaser*")

Effective
**January 26, 2011**





# LIBERTY ASSET MANAGEMENT CORPORATION

## CANCELLATION OF REAL ESTATE OWNED/
## NON-PERFORMING NOTES PURCHASE AND SALE AGREEMENT
## AND RELEASE OF DEPOSIT

Between

## Liberty Asset Management Corporation
("*Seller*")

and

## JD BROTHERS LLC
("*Purchaser*")

Effective
## January 26, 2011



# LIBERTY ASSET MANAGEMENT CORPORATION

### CANCELLATION OF REAL ESTATE OWNED/NON-PERFORMING NOTES PURCHASE AND SALE AGREEMENT AND RELEASE OF DEPOSIT

This Cancellation of Real Estate Owned/Non-Performing Notes Purchase and Sale Agreement and Release of Deposit ("**Cancellation**") is made and entered into as of 26ᵗʰ day of January 2011___ ("**Effective Date**"), by and between Liberty Asset Management Corporation and its respective parent or subsidiary companies and affiliates, ("**Seller**"), a California Corporation whose principal place of business is located at 554 San Antonio Rd, Mountain View, CA 94040, and JD Brothers LLC ("**Purchaser**") whose name, phone number and address are listed below

**PURCHASER:**

Name:   JD Brothers LLC _____

Title: _____

Phone:_____ , _____

Address:_____

**WITNESSETH:**

**WHEREAS,**

1. Seller and Purchaser entered into the Real Estate Owned/Non-Performing Notes Purchase and Sale Agreement with an effective date of 26ᵗʰ day of January 2011___ ("**Agreement**");
2. Seller and Purchaser acknowledge that the Agreement and any other addenda, amendments and related documents shall together be referred to as the "**Agreement**");
3. Seller and Purchaser agree that the Agreement on the property, **165-167 O'Farrell Street, San Francisco** to the Agreement is cancelled and terminated at the request of **both Purchaser and Seller**____.

**NOW THEREFORE,** the parties hereto hereby agree as follows:

**1. CANCELLATION OF AGREEMENT**

1.1   **Cancellation of Agreement**. Seller and Purchaser agree that the Agreement is hereby cancelled and terminated at the request of **both Purchaser and Seller**____.

**2. RELEASE OF DEPOSIT**

2.1   Seller and Purchaser hereby acknowledge that Purchaser's deposit in connection with the Agreement shall be fully refunded to Purchaser.

2.2   The Purchaser's deposit shall be refunded to:

2.2.2   JD Brothers LLC _____
_____
_____

2.3   Purchaser shall return to Seller the attached Acknowledgment of Receipt of Deposit within 2 (two) business days of receipt of the deposit.  Failure to return the Acknowledgement of Receipt of Deposit will void this Cancellation.

**3. MUTUAL RELEASE**

3.1   Purchaser and Seller mutually release each other from all obligation to buy, sell or exchange the property(ies)contained in Exhibit "1" to the Agreement, and from all claims, actions, and demands that each may have against the other(s) by reason of the Agreement.

3.2   Purchaser and Seller intend that all rights and obligations arising out of the Agreement are null and void upon Seller's receipt of Purchaser's Acknowledgement of Receipt of Deposit.

**IN WITNESS WHEREOF**, each of the undersigned parties to this Agreement has caused this Agreement to be duly executed by one of its duly authorized officers or members, all as of the date first written above.

**SELLER**
Liberty Asset Management Corporation

_____   01-26-11
Asset Manager                    Date

**PURCHASER**
JD Brothers LLC

_____   1/26/2011
                                 Date

# EXHIBIT 6



# LIBERTY ASSET MANAGEMENT CORPORATION

## REAL ESTATE OWNED/NON-PERFORMING NOTES PURCHASE AND SALE AGREEMENT

Between

**Liberty Asset Management Corporation**
(*"Seller"*)

and

**JD Brothers, LLC and Sunshine Valley, LLC**

(*"Purchasers"*)

Effective
**January 26, 2011**



# LIBERTY ASSET MANAGEMENT CORPORATION

### REAL ESTATE OWNED/NON-PERFORMING NOTES
### PURCHASE AND SALE AGREEMENT

This Real Estate Owned/Non-Performing Note Purchase and Sale Agreement ("Agreement") is executed on this ___26th__ day of __January___ 20__11__ by and between Liberty Asset Management Corporation and its respective parent or subsidiary companies and affiliates, ("Seller"), a California Corporation whose principal place of business is located at 554 San Antonio Rd, Mountain View, CA 94040, and __JD Brothers, LLC and Sunshine Valley, LLC__ ("Purchasers") whose name, phone number and address are listed below.

___JD Brothers, LLC and Sunshine Valley, LLC__ ("PURCHASERS"):

Name: _____

Title: _____

Phone:_____

Address:_____

**WITNESSETH:**

**WHEREAS,**

1. Seller is the Owner or agent of the "DISTRESS ASSET" Property as identified in Schedule 1 ("Assets" and each an "Asset").

2. Seller and/or Owner desires to sell and Purchasers desire to purchase Seller's and/or Owner's right, title and interest in and to each of the DISTRESS ASSET identified on the attached DISTRESS ASSET Schedule.

**NOW THEREFORE,** the parties hereto hereby agree as follows:

1. **PURCHASE AND SALE OF DISTRESS ASSET**

   1.1 **Purchase and Sale of DISTRESS ASSET.** Seller and/or Owner hereby agrees to sell, assign, transfer, convey and deliver to Purchasers, and Purchasers hereby agrees to purchase from Seller and/or Owner, all of Seller's and/or Owner's right, title and interest in and to the DISTRESS ASSET properties listed in Schedule 1.

   1.2 **Purchase Price.** The individual purchase price for each DISTRESS ASSET property ("Asset Purchase Price") is set forth in the attached Schedule 1.

      1.2.1 **"Asset Purchase Price"** shall mean the individual purchase price for each DISTRESS ASSET as set forth in the attached Schedule 1. The individual purchase price is the amount of the Purchasers' accepted offer.

      1.2.2 **"Gross Aggregate Purchase Price"** for the sale and/or transfer of all of the DISTRESS ASSET Properties shall mean the sum of the Asset Purchase Prices for all DISTRESS ASSET properties identified in Schedule 1.

   1.3 **Payment.** The Gross Aggregate Principal Purchase Price for all DISTRESS ASSET properties listed in Schedule 1 is due and shall be paid upon execution of this Agreement and no later than _February 26___, _2011___. All payments shall be made by wire transfer in immediately available United States funds as directed by Seller.

2. **GENERAL REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER**

   Seller represents and warrants to Purchasers as of the date of execution of this Agreement:

2.1 **Due Formation and Good Standing.** Seller is duly organized, validly existing and in good standing under the laws of its state of organization.

2.2 **Authority and Capacity.** Seller has all requisite power, authority and capacity to enter into this Agreement and to perform its obligations hereunder. Seller has the right to sell its interest in each individual DISTRESS ASSET property.

2.2.1 The execution and delivery of this Agreement, and any related agreements or instruments and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary corporate action.

2.2.2 This Agreement is the binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, receivership, conservatorship, reorganization, fraudulent conveyance or other similar laws relating to or affecting creditor's rights generally and moratorium laws from time to time in effect, and by equitable principles restricting availability of equitable remedies.

2.3 **Statements Made.** No representation, warranty or written statement made by Seller in this Agreement, or in any schedule or exhibit attached hereto, contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading.

2.3.1 Any written broker price opinion obtained by Seller and subsequently made available to Purchasers has not been altered by Seller from what was received. Notwithstanding the preceding sentence, Seller makes no representation or warranty of any kind as to the validity or accuracy of any such broker price opinion furnished by Seller to Purchasers.

3. **SPECIFIC REPRESENTATIONS AND WARRANTIES AS TO THE DISTRESS ASSET PROPERTIES IN SCHEDULE 1**

With respect to each DISTRESS ASSET property contained in Schedule 1, Seller represents and warrants to Purchasers as of the date of execution of this Agreement:

3.1 **Title.** As of the date of execution of this Agreement, the DISTRESS ASSET properties listed in Schedule 1, have not been assigned or pledged by Seller to another Purchaser and Seller is either the agent of the Owner who has title or Seller is the owner of record of the DISTRESS ASSET property(ies) listed in Schedule 1 and has good and marketable title thereto, free and clear of any and all liens or encumbrances (except as otherwise set forth in Section 3.1), and any and all equities, participation interests, claims, pledges, charges, or security interests of any nature, subject to no interest or participation of, agreement with, or approval of any other party, to sell, assign and transfer the same pursuant to this Agreement.

3.2 **DISTRESS ASSET Schedule.** The information set forth in Schedule 1 with respect to the DISTRESS ASSET property(ies) is true and correct in all material respects.

3.3.1 **"DISTRESS ASSET Schedule"** shall mean the schedule of DISTRESS ASSET property(ies) attached hereto as Schedule "1", such schedule setting forth the following information with respect to each DISTRESS ASSET Property: (a) the street address of the DISTRESS ASSET property including the city, state and zip code; (b) the Asset Purchase Price; and (c) the Gross Aggregate Purchase Price;

3.3 **Occupancy.** Seller shall transfer Owner's right, title and interest in and to the DISTRESS ASSET property(ies) purchased upon execution of this Agreement. However, possession of the DISTRESS ASSET property(ies) may not be delivered to Purchasers on the date of execution of this Agreement, and Seller makes no representations or warranties as to the occupancy status of any DISTRESS ASSET property(ies) as of said date.

3.4 **Location of Improvements.** Except as set forth in data or files made available to Purchasers by Seller prior to the date of execution of this Agreement, or identified in an opinion of value (including, but not limited to, a broker price opinion or appraisal) or other data obtained or gathered by or otherwise available to Purchasers prior to the date of execution of this Agreement through its own due diligence, to Seller's actual knowledge, no improvement located on the DISTRESS ASSET property(ies) lies outside the boundaries and building restriction lines of such real property; no improvements on an adjoining property encroach upon the DISTRESS ASSET property(ies); and no DISTRESS ASSET property(ies) or any improvement(s) that is located thereon is in violation of any applicable laws, including zoning and building laws and ordinances.

3.4.1 Except as may be set forth in data or in files made available to Purchasers by Seller prior to the date of execution of this Agreement, or identified in an opinion of value (including, but not limited to, a broker price opinion or appraisal) or other data obtained or gathered by or otherwise available to Purchasers prior to date of execution of this Agreement through its own due diligence, to Seller's actual knowledge.

3.5    **Code Violation Notices.** Seller has notified Purchasers of current code violation notices in its possession relating to the DISTRESS ASSET property(ies) and shall forward same to Purchasers for thirty (30) days following the date of execution of this Agreement.

## 4.   GENERAL REPRESENTATIONS AND WARRANTIES OF PURCHASERS

Purchasers represent and warrant to Seller as of the date of execution of this Agreement:

4.1    **Due Formation and Good Standing.** Purchasers are duly organized, validly existing and in good standing under the laws of its state of organization.

4.2    **Authority and Capacity.** Purchasers have all requisite power, authority, and capacity to enter into this Agreement and to perform their obligations hereunder.

     4.2.1    The execution and delivery of this Agreement and any related agreements or instruments and the consummation of the transactions contemplated hereby and thereby, each has been duly and validly authorized by all necessary company action.

     4.2.2    This Agreement is the binding obligation of Purchasers, enforceable against Purchasers in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, receivership, conservatorship, reorganization, fraudulent conveyance or other similar laws relating to or affecting creditor's rights generally and moratorium laws from time to time in effect, and by equitable principles restricting availability of equitable remedies.

4.3    **No Conflict.** No part of this Agreement or execution and delivery of this Agreement or the consummation of the transaction(s) contemplated hereby or compliance with its terms and conditions, conflicts with, results in the breach of or constitutes a default under, is prohibited by, or requires any additional approval under any of the terms, conditions or provisions of the Purchasers' articles of organization or operating agreement, or any other agreement or instrument to which Purchasers are now a party or by which it is bound, or of any order, judgment or decree of any court or governmental authority applicable to the Purchasers.

4.4    **Statements Made.** No representation, warranty or written statement made by the Purchasers in this Agreement, or in any schedule, exhibit, report, written statement or certificate furnished to Seller by Purchasers in connection with the transactions contemplated hereby, contains, or will contain, any untrue statement of a material fact or omits or will omit, to state a material fact necessary to make the statements contained herein or therein not misleading.

4.5    **Evictions; Security Deposits; Personal Property.** Purchasers acknowledge, that Seller has knowledge of any leases or any security deposits related to any DISTRESS ASSET property(ies) and thus it will be transferred to Purchasers on the date of closing of Escrow.

     4.5.1    Purchasers further acknowledges, understands and agrees that it is responsible to any occupants for the return of the security deposit, if any, related to an DISTRESS ASSET property(ies), and for the property handling of any personal property located at or in an DISTRESS ASSET property(ies), all in accordance with applicable law.

4.6    **Decision to Purchase.** Except as otherwise expressly set forth in this Agreement, neither Seller nor its parent, directors, officers, employees, agents, representatives, attorneys or contractors (collectively, **"Seller Parties"**) have made any guarantees, promises, statements, assurances or warranties, express or implied, to Purchasers including without limitation, any pertaining to the suitability of the DISTRESS ASSET property(ies) contained in Schedule 1 for any purpose, the profitability of owning or operating the DISTRESS ASSET property(ies), the physical or environmental condition thereof, the suitability, habitability or merchantability or fitness of the DISTRESS ASSET property(ies) for Purchasers' intended use or for any use whatsoever, the rentals, income or expenses thereof, the net or gross acreage contained therein, the zoning thereof, the existence or satisfaction of any local, state or federal approvals or permits for the development or use thereof, the availability or existence of water, sewer or other utilities, the existence or nonexistence of any hazardous substances or materials in, on or under the DISTRESS ASSET property(ies), or as to any other past, present or future matter whatsoever.

     4.6.1    Purchasers acknowledges and agrees that the DISTRESS ASSET property(ies) and the date and files made available to it, together with Purchasers' ability to perform its own due diligence on the property, were an adequate and sufficient basis on which to determine whether to purchase the DISTRESS ASSET property(ies) listed in Schedule 1 and to base Purchasers' bid. Purchasers have made such independent investigations and engaged in such other due diligence as it deems to be warranted into the nature, validity, enforceability, collectability and value of the DISTRESS ASSET property(ies), and all other facts Purchasers deem material to its bid for and its purchase of the DISTRESS ASSET property(ies) listed in Schedule 1, and Purchasers are entering into this transaction on the basis of that investigation and Purchasers' judgment.

     4.6.2    Purchasers acknowledge and agree that it has satisfied itself regarding the condition of the DISTRESS ASSET property(ies), and that the DISTRESS ASSET property(ies) contained in Schedule



1 will be purchased **"AS IS AND WITH ALL FAULTS."** Purchasers shall assume the responsibility and risk of all defects to and conditions of the DISTRESS ASSET property(ies) listed in Schedule 1, including such defects and conditions, if any, which cannot be observed by casual inspection. Seller and Purchasers acknowledge and agree that this disclaimer has been specifically negotiated, and that the DISTRESS ASSET property(ies) contained in Schedule 1 will be sold it its then-present condition.

4.6.3     Except to the extent of any express representations contained in this Agreement, Purchasers hereby releases the Seller Parties from any and all amounts, actions, demands, claims, costs, expenses, damages and liabilities (including, without limitation, attorney's fees and costs) (collectively, the **"Liabilities"**) relating to or arising from the condition or status of, or any other matter in any way pertaining to, the DISTRESS ASSET property(ies) listed in Schedule 1. Purchasers acknowledge and agree that the release and discharge given by it hereunder to the Seller Parties extends to all such Liabilities described above, whether known or unknown, foreseen or unforeseen, patent or latent, which Purchasers may at any time have against the Seller Parties.

4.6.4     All the provisions of Section 4 shall survive the execution and delivery of any Deed delivered hereunder and the closing of the contemplated hereby.

## 5. TRANSFER OF INTEREST

5.1.     **Delivery of Seller Documents and Other Items**. On the date of the execution of this Agreement, or as soon as practical thereafter, Seller (or its designee) shall execute and deliver to Purchasers the following (collectively, **"Seller's Closing Documents"**):

5.1.1     A Quit Claim Deed or similar deed (**"Deed"**), or beneficial ownership in a Land Trust or such other documents evidencing transfer of ownership of the properties between the Seller and Purchasers

5.1.2     An Assignment of Deed of Trust evidencing transfer of beneficial interest to the Deed of Trust including but not limited to: (a) Policy of Title Insurance; (b) Copy of Promissory Note(s); (c) Copy of Deed of Trust(s).

5.1.2     Such other documents as are customary and appropriate under local laws for recording in the land records in the jurisdiction in which the DISTRESS ASSET property(ies) is(are) located; and

5.1.3     Keys for those DISTRESS ASSET property(ies) where keys are actually in Seller's possession.

5.2     **Delivery of Purchasers Documents and Other Items**. On the date of execution of this Agreement, Purchasers will execute and/or deliver to Seller or to other applicable parties as instructed by Seller, the following (collectively, **"Purchasers' Closing Documents"**):

5.2.1     The Purchase Price in accordance with Section 2 of this Agreement.

5.2.2     Such Affidavits of Purchasers or other documents, if any, as may reasonably be required by the closing agent to record Seller's Closing Documents.

5.2.3     A signed and executed Resale Agreement.

5.3     **Further Assurances**. Seller and Purchasers each agree to take, or cause to be taken, such acts, including execution and delivery of additional documents, instruments and agreements, as may be reasonably necessary or desirable to carry out the purposes of this Agreement and to consummate the transaction contemplated hereby.

5.3.1     Seller is responsible for depositing and recording the Deeds for recording in their respective counties as soon as practicable following the date of execution of this Agreement, but no later than ninety (90) calendar days after said date. Any costs including but not limited to Owner's Title Insurance Policy, Recording Fees, County and City Transfer Tax, etc. shall be borne by the Purchasers.

5.3.2     Seller shall be responsible for all costs associated with the sale of the DISTRESS ASSET property(ies) up to the date of the recording of the Assignment of the Deed of Trust to Buyer. Any costs thereafter including but not limited to foreclosure fees, servicing fees, attorney's fees, etc., shall be borne by the Purchasers.

5.3.3     If Seller is unable to record a Deed or an Assignment of the Deed of Trust and deliver to Purchasers within ninety (90) calendar days, Seller offers the Purchasers the option of (a) receiving a replacement property of the same or similar characteristics in lieu of the objectionable property or (b) receiving a refund in the purchase price attributable to said property.

## 6. REMEDIES

6.1 **Indemnification by Seller.** Seller shall indemnify and hold Purchasers and its officers, directors, employees and agents harmless from and against, and will reimburse it or them for, any and all third-party losses, damages, deficiencies, claims, costs or expenses, including reasonable attorney's fees and will defend it or them against any third-party claim, demand or litigation arising out of, in connection with or to the extent resulting from:

    6.1.1 Any misrepresentation made by Seller, or in any schedule or exhibit attached hereto, which misrepresentation materially and adversely affects the value of an DISTRESS ASSET property(ies) or materially and adversely affects the interest of the Purchasers in an DISTRESS ASSET property(ies); or

    6.1.2 The non-fulfillment or non-performance of any covenant, condition or action required of Seller pursuant to this Agreement.

6.2 **Limitation of Remedies Regarding Property-Related Expenses.** Purchasers acknowledge and agree that the Purchase Price does not represent full and final settlement of delinquent property taxes or other assessments, homeowner's association dues, special assessments, utilities or other property-related expenses as set forth elsewhere herein.

6.3 **Indemnification by Purchasers.** Purchasers shall indemnify and hold Seller, its shareholders and affiliates and their respective officers, directors, employees and agents, harmless from and against, and must reimburse it or them for, any and all third-party losses, damages, deficiencies, claims, costs or expenses, including reasonable attorney's fees, and defend it or them against any third-party claim, demand, or litigation arising out of, in connection with or to the extent resulting from:

    6.3.1 Any misrepresentation made by Purchasers, or any breach of warranty by Purchasers, contained in this Agreement, or in any schedule, exhibit, report, written statement or certificate furnished by Purchasers pursuant to this Agreement, which misrepresentation or breach of warranty materially and adversely affects the interest of Seller; or

    6.3.2 The non-fulfillment or non-performance of any covenant, condition or action required of Purchasers pursuant to this Agreement.

## 7. CONFIDENTIALITY

7.1 Seller and Purchasers agree that all information and recommendations provided to the other shall be treated as confidential ("Confidential Information").

7.2 Seller and Purchasers agree that no Confidential Information will be disclosed without prior consent of the other party unless:

    7.2.1 Required by law, Court Order or agency directive, or

    7.2.2 Unless Seller or Purchasers expects, in its reasonable opinion, that Seller or Purchasers will be compelled by a court or government agency, to make such disclosure or unless such Confidential Information becomes publicly available or known other than as a result of actions of Seller or Purchasers. In the event Seller or Purchasers are compelled to disclose confidential information by legal process, Seller or Purchasers will use its best efforts to give written notice to the other party prior to such disclosure.

7.2 The provisions of Section 7 shall survive the date of execution of this Agreement.

## 8. FORCE MAJEURE

8.1 If either Seller or Purchasers fail to perform in whole or in part its duties under this Agreement due to an event of force majeure, the performance of such duties shall be suspended during the period of such event of force majeure.

8.2 The party affected by an event of force majeure shall not be in breach of this Agreement if there is any loss or damage, and shall not be liable or responsible for any loss or damage incurred by the other party as a result of any total or partial failure, interruption or delay in performance of its duties and obligations occasioned by an event of force majeure.

8.3 A party that claims that it has been affected by an event of force majeure shall notify the other party of such event of force majeure in writing in the shortest period possible, and shall provide appropriate evidence of the existence and period of the event of force majeure to the other party within fifteen (15) calendar days after its occurrence. A party that claims that the performance of this Agreement is objectively impossible and impractical due to such event of force majeure shall take any reasonable measures to lessen the losses caused by such event of force majeure.

8.4 When the event of force majeure occurs, the parties shall consult with each other regarding the performance of this Agreement. Once the event of force majeure or its effects ceases, both parties shall immediately resume the performance of their respective obligations.

8.5 An event of force majeure refers to any circumstances that cannot be reasonably controlled, predicted, avoided or overcome, and occurs after execution of this Agreement, which make the performance of this Agreement in whole or in part impossible or impracticable as a matter fact, including but not limited to any situation where performance is impossible without unreasonable expenditure. Such circumstances include but are not limited to floods, fires, droughts, typhoons, earthquakes, and other acts of God, traffic accidents, strikes, riots, turmoil and wars (declared or not) and any act or omission of a governmental authority beyond the control of either party.

## 9. MISCELLANEOUS

9.1 **Survival**. The representations, warranties, covenants and agreements contained in this Agreement with respect to each DISTRESS ASSET property(ies) shall survive the date of execution of this Agreement, for that DISTRESS ASSET property(ies) for a period of forty-five (45) calendar days following the date of execution of this Agreement.

   9.1.1 The representations and warranties of the Seller in this Agreement are unaffected by and supersede any provision in any endorsement of any DISTRESS ASSET property(ies) or in any Deed or assignment with respect to such DISTRESS ASSET property(ies) to the effect that such endorsement or Deed or assignment is without recourse or without representation or warranty.

   9.1.2 The provisions of Section 4, Section 6 and Section 7 shall survive the date of execution of this Agreement.

9.2 **Amendment**. This Agreement may not be changed or amended except by an instrument in writing signed on behalf of each of the parties hereto.

9.3 **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall be considered one and the same instrument.

9.4 **Entire Agreement**. This Agreement contains the entire understanding of the parties and supersedes all prior agreements, arrangements and understandings relating to the subject matter thereof. There are no written or oral agreements, understanding, representations or warranties between the parties other than those set forth herein. No representations were made or relied upon by either party except for as set forth.

9.5 **Assignment**. This Agreement is not assignable unless all parties to this Agreement agree by an instrument in writing signed on behalf of each of the parties hereto.

9.6 **Non-Waiver**. Failure of either party to object to or take other action with respect to any conduct of the other party that may be a breach of this Agreement shall be deemed a waiver of any breach or of any future breach of wrongful conduct.

9.7 **Severability**. If any provision of this Agreement or its application to any person or entity or circumstance is found by a court of competent jurisdiction to be invalid, illegal, or unenforceable, such provision will be construed and enforced as if it had been more narrowly drawn so as not to be invalid, illegal, or unenforceable. The remainder of this Agreement or its application to other persons or circumstances shall not be affected and shall remain in full force and effect and will not in any way be affected or impaired thereby.

9.8 **Rights Cumulative; Waiver**. The rights of each of the parties under this Agreement are cumulative, may be exercised as often as any party considers appropriate and are in addition to each such party's rights under any other documents executed between the parties or, except as otherwise modified herein, under law.

   9.8.1 The rights of each of the parties hereunder shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing. Any failure to exercise or any delay in exercising any such rights shall not preclude any other or further exercise of that or any other such right.

   9.8.2 No act or course of conduct or negotiation on the part of any party shall in any way preclude such party from exercising any such right or constitute a suspension or any variation of such right.

9.9 **Notices**. All notices and other communications under this Agreement must be in writing (including a writing delivered by electronic transmission) and are deemed to have been duly given if: (a) when delivered, it is sent by registered or certified mail (return receipt requested); (b) when delivered, it is delivered personally or by facsimile or email (if followed by a copy of the same being delivered to the other party by first class mail or reputable overnight courier); or (c) on the first following business day, if sent by United States Express Mail or other reputable overnight courier, in each case to the parties at the addresses set forth in Section 9.1.1 or at such other addresses as shall be specified by like notice.



9.9.1 Notices shall be sent to the following addresses

> LAMC
> Attn: Sonia Chiou
> 554 San Antonio Rd
> Mountain View, CA 94040
> Phone Number: (650) 559-8811
> Fax: (650) 641-2982
>
> Purchasers
> JD Brothers, LLC
> Sunshine Valley, LLC.
> _____
> _____
> _____

9.10 **Governing Law.** The validity, interpretation, and performance of this Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of California.

9.11 **Waiver of Jury Trial. EACH OF THE PARTIES HERETO WAIVES ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTION(S) CONTEMPLATED HEREBY OR THEREBY IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY PARTY AGAINST THE OTHER PARTY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. EACH OF THE PARTIES HERETO AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS PARAGRAPH AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF OR THEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.**

9.12 **Attorney's Fees.** If either party becomes involved in litigation (including bankruptcy proceedings) or other proceedings arising out of or relating to this Agreement, the court will award legal expenses (including reasonable attorney's fees, court costs and other legal expenses) to the prevailing party. The award for legal expenses will not be computed in accordance with any court schedule, but will be as necessary to fully reimburse all reasonable attorney's fees and other legal expenses paid or incurred in good faith, regardless of the size of the judgment or award, it being the intention of the parties to fully compensate for all the reasonable attorney's fees and other legal expenses paid or incurred in good faith.

> 9.12.1 For the purpose of this Agreement, the terms **"attorney's fees"** or **"attorney's fees and costs"** mean the fees and expenses of counsel, printing, duplicating and other expenses, air freight charges, and fees billed for law clerks, paralegals, librarians and other not admitted to the bar but performing services under the supervision of any attorney.

> 9.12.2 The terms **"attorney's fees"** or **"attorney's fees and costs"** also include all reasonable fees and expenses incurred with respect to appeals, bankruptcy and other proceedings, and whether or not any action or proceeding is brought with respect to the matter for which said fees and expenses were incurred.

9.13 **Successors and Assigns.** This Agreement is binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and their respective permitted successors and assigns.

9.14 **Time is of the Essence.** The parties to this Agreement acknowledge and understand that time is of the essence.

**IN WITNESS WHEREOF,** each of the undersigned parties to this Agreement has caused this Agreement to be duly executed by one of its duly authorized officers or members, all as of the date first written above.

**SELLER**
Liberty Asset Management Corporation

_____   1/26/11
Asset Manager                    Date

_____
                                 Date

**PURCHASERS**
JD Brothers, LLC and Sunshine Valley, LLC

_____   1/26/2011
JD Brothers, LLC                 Date

_____
Sunshine Valley, LLC             Date

_____  _____
Title                            Date

_____  _____
Title                            Date

**SCHEDULE 1**

**DISTRESS ASSET PROPERTY(IES)**

| Address | City | State | Zip | Asset Purchase Price |
|---|---|---|---|---|
| 166 Geary Street | San Francisco | CA | 94108 | $36,000,000.00 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**JD Brothers, LLC Gross Aggregate Purchase Price  $18,000,000.00**
**(50% of ownership)**
**Sunshine Valley, LLC Gross Aggregate Purchase Price $18,000,000.00**
**(50% of ownership)**

# EXHIBIT 7

# PROMISSORY NOTE

Principal Amount: $2,000,000.00
Date: 4/21/2011

FOR VALUE RECEIVED, I, Benny Kirk (Borrower) promise to pay THE GUO
/HUANG FAMILY TRUST Revocable Trust (Lender) the sum of Two Million
Dollars ($2,000,000.00) and interest at the yearly rate of 4% on the unpaid
balance as specified below.

Payment shall be made in monthly interest only installments, consisting of
$6,666.66 per installment on the 1st day of each month and continue through for
3 months, or until the principal is paid in full.

OR, Borrower will pay one lump payment in lawful money of the United States on:
7/21/2011.

Lender wires the amount of Two Million Dollars into Mega Bank, Vista Escrow,
for Borrower to purchase of 166 Geary Street, San Francisco.

If the Borrower fails to make an installment payment when due or fails to comply
with any other term of this promissory note, the loan will be considered in default.

Payments will be applied first to interest and then to principal.

This note may be prepaid by the Borrower at any time in whole or in part without
premium or penalty.

The Borrower must promptly inform the Lender of any change in name or
address.

If the Lender prevails in a lawsuit to collect on this note, Borrower will pay
Lender's court costs, collection agency costs, and attorney's fees in an amount
the court find to be reasonable.

In WITNESS WHEREOF, I set my hand under seal this ___ the day of
_____, 20 ___ and I acknowledge receipt of a completed copy of this
instrument.


Benny Kirk

# CALIFORNIA ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

State of California

County of <u>Santa Clara</u>

On <u>April 21, 2011</u> before me, <u>Sonia Ming-Jiu Chiou, Notary Public</u> ,

<div align="center">(Here insert name and title of the officer)</div>

personally appeared <u>Benny Kirk</u> ,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature of Notary Public

(Notary Seal)

> SONIA M J CHIOU
> COMM. # 1855996
> NOTARY PUBLIC - CALIFORNIA
> SANTA CLARA COUNTY
> My Comm. Expires June 28, 2013

---

## ADDITIONAL OPTIONAL INFORMATION

### DESCRIPTION OF THE ATTACHED DOCUMENT

Promissory Note
<div align="center">(Title or description of attached document)</div>

_____
<div align="center">(Title or description of attached document continued)</div>

Number of Pages <u>1</u>   Document Date <u>4/21/11</u>

_____
<div align="center">(Additional information)</div>

### CAPACITY CLAIMED BY THE SIGNER

- ☒ Individual (s)
- ☐ Corporate Officer
  _____
  <div align="center">(Title)</div>
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

### INSTRUCTIONS FOR COMPLETING THIS FORM

*Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they- is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document

# EXHIBIT 8

## OPERATING AGREEMENT
## OF
## HK Grace Building LLC

This Operating Agreement ("Agreement") of HK Grace Building LLC (the "Company") effective as of this 6th day of August, 2012, by, between and among the undersigned confirms our understanding as to the matters contained herein.

The parties hereto agree as follows:

## ARTICLE 1

## Definitions

SECTION 1.1. As used herein, the following terms and phrases shall have the meanings indicated:

A.     "Act" shall mean the Limited Liability Company Act of the State of organization, as amended.

B.     "Capital Account" shall mean, with respect to each Member, the account established for each Member pursuant to Section 6.5, which will initially equal the Capital Contributions of such Member and will be (a) increased by the amount of Net Profits allocated to such Member and (b) reduced by the amount of Net Losses allocated to such Member and the amount of Cash Flow distributed to such Member.  Members' Capital Accounts shall be determined and maintained in accordance with the rules and paragraph (b)(2)(iv) of Regulation Section 1.704-1 of the Code.

C.     "Capital Contributions" shall mean the fair market value of the amounts contributed by the Members pursuant to Section 6.1.

D.     "Cash Flow" shall have the meaning provided in Section 7.1.

E.     "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

F.     "Operating Manager" shall mean the individual, company or Member(s) selected by the Members in accordance with this Agreement to serve as Operating Manger or Operating Managers of the Company.

G.     "Members" shall mean the persons designated as such in Schedule A of this Agreement, any successor(s) to their interests as such in the Company; and any other person who pursuant to this Agreement shall become a Member, and any reference to a "Member" shall be to any one of the then Members.

H.     "Net Profits" and "Net Losses" shall mean the net profit or net loss, respectively, of the Company determined in accordance with Section 8.1.

I.     The words "Membership Interest" shall mean a Member's interest in the Company which shall be in the proportion that the Member's share of the profits and losses of the Company bears to the aggregate shares of all the Members.  A Membership Interest may be evidenced by a certificate issued by the Company.  A Membership Interest may be expressed on a certificate as "Units" where a Member's Units bears the same relationship to the aggregate Units of all Members that the Member's Membership Interest bears to the aggregate Membership Interests of all Members.  A Member's Interest may be a certified security or an uncertificated security within the meaning of section 8-102 of the Uniform Commercial Code if the requirements of section 8-103(c) are met, and if the requirements are not met such interest shall, for purposes of the Uniform Commercial Code, be deemed to be a general intangible asset.

J.     "Company" shall mean this Limited Liability Company.

K.      "Person" shall mean any natural person, corporation, partnership, joint venture, association, limited liability company or other business or legal entity.

## ARTICLE II

### Organization of the Company

SECTION 2.1. The purpose of the Company is to conduct any lawful business for which limited liability companies may be organized and to do all things necessary or useful in connection with the foregoing.

SECTION 2.2. The Company name shall be "HK Grace Building LLC".

SECTION 2.3. The Members shall be Members in the Company and shall continue to do business under the name of the Company until the Operating Managers shall change the name or the Company shall terminate.

SECTION 2.4. The principal address of the Company shall be such place or places as the Operating Mangers may determine.  The Operation Managers will give notice to the Members promptly after any change in the location of the principal office of the Company.

## ARTICLE III

### Status of Members

SECTION 3.1. No Member will be bound by, or be personally liable for the expenses, liabilities or obligations of the Company.

SECTION 3.2. No Member will be entitled to withdraw any part of his Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.

SECTION 3.3. No Member will have the right to require partition of the Company property or to compel any sale or appraisal of the Company's assets or any sale of a deceased Member's interest in the Company's assets, notwithstanding any provision of law to the contrary.

## ARTICLE IV

### Meeting of Members

SECTION 4.1. An annual meeting of Members shall be held within five (5) months after the close of the fiscal year of the Company on such date and at the time and place (either within or without the state of its organization) as shall be fixed by the Members.  At the annual meeting, the Members shall elect the Operating Managers and transact such other business as may properly be brought before the meeting.

SECTION 4.2. A special meeting of Members may be called at any time by the Operating Managers and shall be called by the Operating Managers at the request in writing of that Membership interest specified in Schedule C of the Members entitled to vote at such meeting. Any such request shall state the purpose or purposes of the proposed meeting. Business transacted at any special meeting of Members shall be confined to the purposes set forth in the notice thereof.

SECTION 4.3. Written notice of the time, place and purpose of every meeting of Members (and, if other than an annual meeting, the person or persons at whose direction the meeting is being called), shall be given by the Operating Mangers to each Member of record entitled to vote at such meeting, not less than ten nor more than sixty days prior to the date set for the meeting.  Notice shall be given either personally or by mailing said notice by first class mail to each Member at his address appearing on the record book of the Company or at such

other address appearing on the record book of the Company or at such other address supplied by him in writing to the Operating Managers of the Company for the purpose of receiving notice.

A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice. The attendance by a Member at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such Member.

All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

SECTION 4.4. The holders of a majority in interest of the Members present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of members except as otherwise provided by statute of the Articles of Organization. If, however, a quorum shall not be present or represented at any meeting of Members, the Members entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting or originally notified. When a quorum is once present to organize a meeting, such quorum is not deemed broken by the subsequent withdrawal of any Members.

SECTION 4.5. Every Member entitled to vote at any meeting shall be entitled to vote in accordance with his membership interest in the Company held by him of record on the date fixed as the record date for said meeting and may so vote in person or by proxy. Any Company action shall be authorized by a majority in interest of the votes cast by the Members entitled to vote thereon except as may otherwise be provided by statute, the Articles of Organization or this Operating Agreement.

SECTION 4.6. Every proxy must be signed by the Member entitled to vote or by his duly authorized attorney-in-fact and shall be valid only if filed with the Operating Managers of the Company prior to the commencement of voting on the matter in regard to which said proxy is to be voted. No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy. Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by statute. Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the Member who executed such proxy and the revocation is filed with the Operating Managers of the Company prior to the voting of the proxy.

SECTION 4.7. All meetings of Members shall be presided over by the Operating Mangers, or if not present, by a Member thereby chosen by the Members at the meeting. The Operating Managers or the person presiding at the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 4.8. For the purpose of determining the Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the Members entitled to receive payment of any distribution of Cash Flow or the allotment of any rights, or for the purpose of any other action, the Members may fix, in advance, a date as the record date for any such determination of Members. Such date shall not be more than fifty nor less than ten days before the date of any meeting nor more than fifty days prior to any action taken without a meeting, the payment of any distribution of Cash Flow or the allotment of any rights, or any other action. When a determination of Members of record entitled to notice of, or to vote at any meeting of Members has been made as provided in this Section, such determination shall apply

to any adjournment thereof, unless the Members fix a new record date under this Section for the adjourned date.

SECTION 4.9. The company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the Act.

## ARTICLE V

## Management

SECTION 5.1. The right to exercise the powers of the Company and to manage the business and affairs of the Company is vested entirely in the Operating Manager(s) and Managing Member(s) assigned by Members as shown in Schedule A.

SECTION 5.2. The Operating Mangers shall hold office for the term for which elected and until a successor has been elected and qualified.  A vacancy in the office of Operating Manager arising from any cause may be filled for the unexpired portion of the term by the Members.

SECTION 5.3. Any Operating Manager may resign at any time by giving written notice to the Members.  Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

SECTION 5.4. The Company shall be managed by the Operating Manager and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Operating Manager in accordance with this Agreement.  In addition to and not in limitation of any rights and powers conferred by law or other provisions of this Agreement, the Operating Manager shall have and may exercise on behalf of the Company all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits.

SECTION 5.5. Notwithstanding the foregoing, the Operating Manager may not make any of the management decisions stated in Schedule B without obtaining the consent of that Membership Interest stated in Schedule B.

SECTION 5.6. The Operating Manager shall service as Tax Matters Member as such term is defined in Code Section 6231 (a)(7).

SECTION 5.7. Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or interstate, then, is or was a manager, Member, employee or agent of the Company, or then serves or has served on behalf of the Company in any capacity at the request of the Company, shall be indemnified by the Company against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, to the fullest extent permissible by the Act.  Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

## ARTICLE VI

## Capital

SECTION 6.1. The Members have contributed to the Company in exchange for their membership interests, the cash and other property as set forth on Schedule A, annexed hereto.

SECTION 6.2. The fair market value and the adjusted basis of the contributing Member of any property other than cash contributed to the Company by a Member shall be set forth on Schedule A, annexed hereto.

SECTION 6.3. Except as expressly provided in this Agreement, no Member shall be required to make any additional contributions to the capital of the Company.

SECTION 6.4. No interest shall be paid on the Capital Account of any Member.

SECTION 6.5. A Capital Account shall be established for each Member on the books and records of the Company. If any assets of the Company are distributed to the Members in kind, the Capital Accounts of the Members shall be adjusted to reflect the difference between the fair market value of such assets on the date of distribution and the basis of the Company in such assets.

## ARTICLE VII

### Distributions of Cash

SECTION 7.1. The Company shall distribute to the Members from time to time all cash (regardless of the source thereof) of the Company which is not required for the operation or the reasonable working capital requirements of the Company (such cash is sometimes referred to herein as "Cash Flow"). For purposes of this Agreement all Cash Flow allocated to the Members shall be allocated among them in proportion to their respective Membership Interests.

SECTION 7.2. Distributions of Cash Flow shall be made from time to time in such manner as determined by the Operating Managers.

## ARTICLE VIII

### Profits and Losses

SECTION 8.1. The Net Profits and Net Losses of the Company shall be the net profits and net losses of the Company as determined for Federal income tax purposes.

SECTION 8.2. The Net Profits and Net Losses of the Company and each item of income, gain, loss, deduction or credit entering into the computation thereof, shall be allocated to the Members in the same proportions that they share in distributions of Cash Flow pursuant to Section 7.1, or if there is no Cash Flow, that they would have shared if there had been Cash Flow.

SECTION 8.3. References herein to "Reg. Sec.", are to the regulations promulgated by the United States Treasury to the Code. The terms "minimum gain", "minimum gain chargeback", "qualified income offset", "nonrecourse deduction" and "nonrecourse liability" are to be interpreted consistent with the definitions and use of such terms in Reg. Sec. 1.704-2 and Reg. Sec. 1.704-1. The following special allocations shall be made in the following order:

A.      Except as other set forth in Reg. Sec. 1.704-2(f), if there is a net decrease in minimum gain, during the fiscal year of the Company, each Member, shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease of minimum gain determined in accordance with Reg. Sec. 1.704-2(g). Allocations in accordance with this Section shall be made first from the disposition of Company assets subject to nonrecourse liabilities, to the extent of the minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the taxable year. This Section is intended to comply with the minimum gain chargeback requirement of Reg. Sec. 1.704-2(f).

B.      Except as otherwise set forth in Reg. Sec. 1.704-2(i)(4), if there is a net decrease in a Member's nonrecourse liability minimum gain attributable to Members' nonrecourse liabilities during any fiscal year, each Member who has a share of the Member nonrecourse liability minimum gain attributable to Member nonrecourse liability shall be specially allocated items of gross income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to that Member's share of the net decrease in Members' nonrecourse debt minimum gain attributable to such member nonrecourse debt. Allocations pursuant to this Section shall be made first from gain recognized from the disposition of Company assets subject

to Member nonrecourse liabilities to the extent of Member minimum gain attributable to those assets, and thereafter, from a pro-rata portion of the Company's other items of income and gain for the fiscal year. This section is intended to comply with the minimum gain chargeback requirements of Reg. Sec. 1.704-2(i).

      C.     A Member who unexpectedly receives an adjustment, allocation or distribution described in (4), (5) or (6) of Reg. Sec. 1.704-1(b)(2)(ii)(d) will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. An allocation shall be made pursuant to this Section and if and to the extent a Member would have a deficit in his adjusted Capital Account after all other allocations provided for in this Section 8.3 were made as if this paragraph were not in the Agreement.

      D.     Nonrecourse deductions shall be allocated among the Members in the same proportion in which they share the Cash Flow of the Company.

      E.     Any nonrecourse deduction shall be allocated to any Member who bears the economic risk of loss with respect to the Member nonrecourse liability to which such deduction is attributable.

      SECTION 8.4. Any Company gain or loss realized with respect to property, other than money, contributed to the Company by a Member shall be shared among the Members pursuant to Code section 704(c) and regulations to be promulgated thereunder so as to take account of the difference between the Company basis and the fair market value of the property at the time of the contribution ("built-in gain or loss"). Such built-in gain or loss shall be allocated to the contributing Member upon the disposition of the property.

## ARTICLE IX

### Admission and Withdrawal of a Member

      SECTION 9.1. A Member may transfer his interest in the Company to another person or entity only with the prior unanimous consent of the other Members either in writing or at a meeting called for such purpose. If all of the other Members do not approve of the transfer, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee shall be entitled to receive the share of profits, losses and Cash Flow or other compensation by way of income and the return of contributions to which the transferor otherwise would be entitled.

      SECTION 9.2. The Members agree to sign such additional documents as may be required in order to admit additional Members to the Company, pursuant to section 9.1 as well as, among other things, to provide for the division of profits, losses and Cash Flow among the Members.

      SECTION 9.3. All costs and expenses incurred by the Company in connection with the assignment of a Member's interest, including any filing fees and publishing costs and the fees and disbursements of counsel, shall be paid by the assigning Member.

      SECTION 9.4. Each person who becomes a Member in the Company, by becoming a Member, shall and does hereby ratify and agree to be bound by the terms and conditions of this Agreement.

## ARTICLE X

### Termination or Dissolution of Company

      SECTION 10.1. The Company shall be terminated prior to the date of expiration of the term provided in Section 2.5 if (a) a majority in interest of the Members consent that the Company should be terminated and dissolved, or (b) the Company is dissolved pursuant to this Agreement.

      SECTION 10.2. The Company shall be terminated in the event any Member (i) withdraws, resigns or is expelled from the Company; (ii) makes an assignment for the benefit of creditors, is

the subject of an order for relief under Title 11 of the United States Code, files a petition or answer seeking for himself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him in any proceeding of this nature, seeks, consents to, or acquiesces in the appointment of a trustee, receiver or liquidator for all or any substantial part of his properties; (iii) dies; or (iv) a judgment is entered by a court of competent jurisdiction adjudicating him incompetent to manage his person or his property.

SECTION 10.3. If the Company is dissolved, the owners of a majority in interest of the remaining Members may elect to reconstitute and continue the Company as a successor Company upon the same conditions as are set forth in this Agreement. Any such election to continue the Company will not result in the creation of a new Company among the remaining Members, nor will such election require the amendment of this Agreement or the execution of an amended Agreement.

SECTION 10.4. Upon the termination and dissolution of the Company, the then Operating Manager, or Operating Managers, if any, or, if there is no Operating Manager, any person elected to perform such liquidation by the written consent of the owners of a majority in interest of the Members, shall proceed to the liquidation of the Company. The proceeds of such liquidation shall be applied and distributed as follows:

A. If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be determined by an independent appraiser to be selected by the Company's independent public accountants. The amount by which the fair market value of any Property to be distributed in kind to the Members exceeds or is less than the basis of such Property, shall, to the extent not otherwise recognized by the Company, be taken into account in computing Net Profits or Net Losses (and shall be allocated among the Members in accordance with Section 8.2) for purposes of crediting or charging the Capital Accounts of, and liquidating distributions to, the Members under Section 10.4.B.

B. All distributions upon liquidation of the Company shall be distributed as follows: to each of the Members, in proportion to the amount of their respective positive Capital Accounts, as such accounts have been adjusted (i) in accordance with Section 6.5 to reflect the Net Profit or Net Loss realized or incurred upon the sale of the Company's property or assets and deemed sale pursuant to Section 10.4.A; (ii) in accordance with Section 8.2 to reflect all Net Profits or Net Losses with respect to the year of liquidation. No Member shall be liable to repay the negative amount of his Capital Account.

SECTION 10.5. Each of the Members shall be furnished with a statement, reviewed by the Company's independent public accountants, which shall set forth the assets and liabilities of the Company as of the date of the Company's liquidation. Upon completion of the liquidation, the Operating Managers shall execute and cause to be filed a Certificate of Dissolution of the Company and any and all other documents necessary with respect to termination of the Company.

## ARTICLE XI

## Books and Reports

SECTION 11.1. The Operating Mangers shall cause the Company to maintain the following records:

A. Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company, shall be kept by the Operating Managers at the principal office of the Company. The fiscal year of the Company shall be the calendar year. The books of account of the Company shall be kept in accordance with sound accounting practices and principles applied in a consistent manner by the Company; provided, however, that all methods of accounting and treating particular transactions shall be in accordance with the

methods of accounting employed for Federal income tax purposes. All determinations by the Operating Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon al the Members unless the determination is inconsistent with any express provision of this Agreement.

B.      A current list of the full name and last known mailing address of each Member set forth in alphabetical order together with the contribution and share in profits and losses of each Member; a copy of the Articles of Organization of the Company and any amendments thereto; a copy of the Company Operating Agreement and any amendments thereto; a copy of the Company's federal, state and local income tax returns for the three most recent fiscal years.

C.      Any member shall have the right from time to time at his expense to have his accountants and representatives examine and/or audit the books and records of the Company and the information referred to in this Section, and the Operating Managers will make such books and records and information available for such examinations and/or audits.

SECTION 11.2. No value shall be placed for any purpose upon the Company name or the right to its use, or upon the goodwill of the Company or its business. Upon termination or dissolution of the Company (without reconstitution thereof) as provided in this Agreement, neither the Company name or the right to its use, nor the goodwill of the Company, shall be considered as an asset of the Company.

SECTION 11.3. The Operating Managers will cause to be sent to the Members within a reasonable period after the close of each year the following: (a) annual statements of the Company's gross receipts and operating expenses, and the capital accounts of each Member, prepared by the Company's independent public accountants, to be transmitted to each Member; and (b) a report to be transmitted to each Member indicating the Member's share of the Company's profit or loss for that year and the Member's allocable share of all items of income, gain, loss, deduction, and credit, for Federal income tax purposes.

## ARTICLE XII

### Tax Elections

SECTION 12.1. In the event of a transfer of a Member's interest, or upon the death of a Member, or in the event of the distribution of Company property to any party hereto, the Company may (but need not necessarily) file an election, in accordance with Section 754 of the Code to cause the basis of the Company Property to be adjusted for Federal income tax purposes, as provided by Sections 734 and 743 of the Code.

## ARTICLE XIII

### Miscellaneous

SECTION 13.1. Any notice or other communication under this Agreement shall be in writing and shall be considered given when mailed by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party shall have previously specified by notice to the others as the address to which notice shall be given to him):

A.      If to the Company, to it in care of the Operating Managers at the address of the Company.

B.      If to the Operating Managers, to them at the address of the Company.

C.      If to any Member, to him at his address set forth on the books and records of the Company.

SECTION 13.2. This Agreement contains a complete statement of all of the arrangements among the parties with respect to the Company and cannot be changed or terminated orally or in

any manner other than by a written agreement executed by all of the Members. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

SECTION 13.3. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

SECTION 13.4. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations of the jurisdiction in which the Company does business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

SECTION 13.5. Anything hereinbefore in this Agreement to the contrary notwithstanding, all references to the Property of the Company are deemed to include the profits, losses and Cash Flow of the Property.

SECTION 13.6. Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of organization of the Company applicable to agreements made and to be performed in the State of organization of the Company.

SECTION 13.7. The captions, headings and table of contents in this Agreement are solely for convenience of reference and shall not affect its interpretation.

SECTION 13.8. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall be deemed to constitute a single document.

SECTION 13.9. Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

IN WITNESS WHEREOF, the undersigned have duly executed this Operating Agreement as of the date first above written as Members.

JD Brothers LLC, Member

HK Grace Manager LLC, Manager

Sun Valley Management LLC, Member

**"SCHEDULE A"**

**OPERATING AGREEMENT
OF
HK GRACE BUILDING LLC**


Percentage Interests of Members of HK Grace Building LLC:

| Member Name | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| JD Brothers LLC | $8,000,000 | 44.4% |
| Sun Valley Management LLC | $10,000,000 | 55.6% |

**"SCHEDULE B"**

**OPERATING AGREEMENT**
**OF**
**HK GRACE BUILDING LLC**

Operating Managers may not make any of the following management decisions without obtaining the consent of that Membership Interest:

    a.  any merger, consolidation or other business combination;
    b.  sale or other disposition of substantially all the assets of the LLC;
    c.  dissolution of the LLC;
    d.  filing of a petition or commencing other proceedings seeking reorganization;
    e.  liquidation, arrangement or other similar relief under any federal or state law relating to bankruptcy or insolvency;
    f.  the amendment or modification of any provision of this Agreement;
    g.  the issuance of additional LLC Units to any Member or other person;
    h.  the removal of any Member;
    i.  the decision to appoint managers for the LLC under Article V

**"SCHEDULE B"**

**OPERATING AGREEMENT
OF
HK GRACE BUILDING LLC**

Operating Managers may not make any of the following management decisions without obtaining the consent of that Membership Interest:

    a.   any merger, consolidation or other business combination;
    b.   sale or other disposition of substantially all the assets of the LLC;
    c.   dissolution of the LLC;
    d.   filing of a petition or commencing other proceedings seeking reorganization;
    e.   liquidation, arrangement or other similar relief under any federal or state law relating to bankruptcy or insolvency;
    f.   the amendment or modification of any provision of this Agreement;
    g.   the issuance of additional LLC Units to any Member or other person;
    h.   the removal of any Member;
    i.   the decision to appoint managers for the LLC under Article V

# EXHIBIT 9

**Amendment A: Amendment to Operating Agreement of HK Grace Building LLC**

This is an amendment to the Operating Agreement of HK Grace Building LLC of August 6, 2012, between members of JD Brothers LLC and Sunshine Valley Management LLC.

**Amendment to the Operating Agreement Section 4.4.**
**Original terms in Section 4.4 is now over written by the Amendment and reads as follows:**

"The holders of at least 75% in interest of the Members present in person or in represented by proxy, shall be requisite and shall constitute a quorum. If however, a quorum shall not be present or represented at any meeting of members, the members entitled to vote thereat shall have the power to adjourn the meeting until a quorum shall be present or represented."

**Amendment to the Operating Agreement Section 4.5.**
**Original terms in Section 4.5 is now over written by the Amendment and reads as follows:**
"Any company action shall be authorized by consensus approval of all members in Schedule A, regardless of shares in interests."

**Amendment to the Operating Agreement Section 5.5.**
**Original terms of Operating Agreement in Section 5.5 is now over written by the Amendment and reads as follows:**
"The Operating Manager may not make any of the management decisions stated in Schedule B without obtaining the written approval of all members stated in Schedule A."

**Amendment to the Operating Agreement Article V.**
**Original terms of Operating Agreement Article V is now expanded with the addition of Section 5.8 and Section 5.9 which are read as follows:**

" Section 5.8 Operating Manager shall be elected by the consensus approval of all members in Schedule A at each annual meeting of Members and service for one year unless extend by written approval of all Members in Schedule A"

"Section 5.9 Any Member in Schedule A has the right to terminate the Operating Manager, with or without cause, at its sole discretion and cause to reelection of new Operating Manager."

**Amendment to the Operating Agreement Section 7.2.**



**Original terms of Operating Agreement in Section 7.2 is now over written by the Amendment and reads as follows:**

"Distribution of cash flow shall be made from time to time in such manner as determined by all members shown in Schedule A."

**Amendment to the Operating Agreement Schedule B.**
**Original terms of Operating Agreement Schedule B is now expanded with the addition of terms of j, k, l, m and n and reads as follows:**

"j. Acquisition of properties valued more than 5% of the Company assets or valued more than $50,000 in amount."

"k. Make loans in any amount to any members or any third party."

"l. Assume any loans or take any loans from any sources."

"m. Make decision or conduction other than for the best interest of the Company and for the best interest of its all members."

"n. Take compensations without the consensus approval of all members in Schedule A."

**Amendment to the Operating Agreement Schedule B.**
**Original terms of Operating Agreement Schedule B Section Schedule B.b is now over written by the Amendment and reads as follows:**

"b. Sale or other deposition of any assets of the LLC."

In witness whereof, the undersigned have duly execute this Amendment to the Operating Agreement of August 6th, 2012 as of the date first written bellow as members.

_____     1/19/14
Sunshine Valley Management LLC, Member     Date

_____     1/21/14
JD Brothers LLC, Member     Date

# ACKNOWLEDGMENT

State of California
County of _____ Los Angeles _____ )

On _January 16, 2014_____ before me, __Helena Cosman_____

(insert name and title of the officer)

personally appeared ___Benny Kirk_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____    (Seal)

HELENA COSMAN
COMMISSION# 1916767
NOTARY PUBLIC
SAN DIEGO COUNTY, CALIFORNIA
Commission Expires Dec. 12, 2014

**Certificate of Acknowledgement**

State of California      )

County of San Mateo  )

On _JANUARY 21, 2014_ before me, Mercedes E. Navarro,   Notary Public,
<span style="font-size:small">Date</span>

personally appeared _WEI HUANG_____, who proved to me
on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity (ies), and that by his/her/their signature(s) on the instrument the person(s), or entity upon
behalf of which the person(s) acted, executed the instrument.

I certify under the PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS MY HAND AND OFFICIAL SEAL.

Signature _____

Seal:

> **MERCEDES E. NAVARRO**
> **COMM. #1946220**
> NOTARY PUBLIC • CALIFORNIA
> SAN MATEO COUNTY
> My commission expires July 31, 2015

This Certificate is attached to the following document:

_AMENDMENT A: AMENDMENT_____ dated: _1/21/2014_
_TO OPERATING AGREEMENT OF_
_HW GRADE BUILDING LLC_

# EXHIBIT 10

## AMENDMENT TO PROMISSORY NOTE

Promissory Note:

1) Principle Amount: $2,000,000.00 (Two Million Dollars)
2) Date: April 21, 2011
3) Due Date: July 21, 2011
4) Yearly interest rate: 4%

The previous Promissory Note in the above is hereby amended and/or supplemented in the following particulars only:

1) **Borrower and Lender agree to extend the mature date to July 21, 2012.**

2) **Borrower and Lender agree the yearly interest rate modified to 5%.**

3) **ALL OTHER TERMS AND CONDITIONS SHALL REMAIN THE SAME.**

In WITNESS WHEREOF, I set my hand under seal this _21_ the day of _June_, 2012 and I acknowledge receipt of a completed copy of the instrument.



Benny Kirk

State of California

County of Santa Clara

On June 21, 2012 before me, Sonia Ming-Jiu Chiou, Notary Public personally appeared **Benny Kirk**

who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity and that by his signature on the instrument the person, or entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature of Notary Public

SONIA M J CHIOU
COMM. # 1855996
NOTARY PUBLIC - CALIFORNIA
SANTA CLARA COUNTY
My Comm. Expires June 26, 2013

(Notary Seal)

# EXHIBIT 11

## AMENDMENT TO PROMISSORY NOTE

Original Promissory Note:

1) Principle Amount: $2,000,000.00 (Two Million Dollars)
2) Date: April 21, 2011
3) Due Date: July 21, 2011
4) Yearly interest rate: 4%

Amendment 1:

1) Amended to Original Promissory Note, Dated April 21, 2011.
2) Date: June 21, 2011
3) Due Date: July 21, 2012
4) Yearly interest rate: 5%

The previous Promissory Note and Amendment 1 in the above are hereby amended and/or supplemented in the following particulars only:

**1) Borrower and Lender agree to extend the mature date to December 31, 2013.**

**2) Borrower and Lender agree the yearly interest rate modified to 8%.**

**3) ALL OTHER TERMS AND CONDITIONS SHALL REMAIN THE SAME.**

In WITNESS WHEREOF, I set my hand under seal this 21st _ the day of _July_, 2013 and I acknowledge receipt of a completed copy of the instrument.

Benny Kirk

State of California

County of Santa Clara

On July 21, 2013 before me, Sonia Ming-Jiu Chiou, Notary Public personally appeared **Benny Kirk**

who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity and that by his signature on the instrument the person, or entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature of Notary Public

(Notary Seal)

# EXHIBIT 12

 **Liberty Asset Management Corporation**

## Distressed Property Portfolio Retail Management Agreement

Distressed Property Portfolio Retail Management Agreement ("Agreement") by and between Liberty Asset Management Inc., ("LAMC") and Portfolio Owner ("Owner") is effective March 22, 2010. This Agreement outlines facilitating acquisition, market analysis, foreclosure process, wholesales, retails, repairs, management duties.

LAMC is engaging in a business relationship with Portfolio Owner. To provide access to distressed Real Estate assets in various stages of non-performance. LAMC will provide disposition solution services of the assets for the Portfolio Owner.  Portfolio Owner recognizes the necessity of the services provided by LAMC to obtain investment capital and profits. LAMC and Portfolio Owner will share in the profits for LAMC's access and disposition expertise and services.

WHEREAS, the Portfolio Owner's LLC. is a common fund for distressed real estate-related portfolio ("Real Estate Investments") for distressed real estate assets. Portfolio Owner has determined to purchase distressed assets through LAMC established relationships.

Portfolio Owner will be purchasing distressed assets through LAMC. Portfolio Owner will become the distressed asset portfolio owners. LAMC will process the distressed asset portfolio through foreclosure process and wholesale and/or retail sale channels for maximum profit. Portfolio Owner will reimburse LAMC through close of escrow for providing portfolio management of the distressed assets and disposition services and will advance all fees necessary for managing the portfolio which includes property maintenance / clean-up, appraisal / BPO, property insurance, property taxes, legal fees, administrative fees, cost of restoring the property to saleable condition, and cost of sale.

Portfolio Owner is duly organized, validly existing and in good standing under the laws of the state of California to provide the services set forth in this Agreement with respect to the analysis, acquisition, management and disposition by the Portfolio Owner of interests in real property.

The Portfolio Owner and LAMC will be working together to maximize profits of the distressed real estate asset portfolio and each party acknowledges they are duly organized, validly existing and in good standing under the laws of the State of its organization and with full power and authority to execute, deliver and perform this Agreement and to enter into and consummate the transactions contemplated by this Agreement.  Portfolio Owner is duly qualified and in good standing in all jurisdictions where it is required to be qualified, except where the failure to be qualified is not material.  Portfolio Owner has taken all action required to authorize its execution, delivery and performance of this Agreement.  Below is the contact person for each entity that has the authorization to discuss details regarding the distressed asset portfolio(s).

LAMC CONTACT:

Audra Martin

Vice President of Portfolio Division

Phone:   626-214-2154

Address: 3218 E. Holt Avenue #212, West Covina, CA  91791

PORTFOLIO OWNER CONTACT:

Name: _____

Title: _____

Phone: _____

Address: _____



# Liberty Asset Management Corporation

### Distressed Property Portfolio Retail Management Agreement

Distressed Property Portfolio Retail Management Agreement ("Agreement") by and between Liberty Asset Management Inc., ("LAMC") and Portfolio Owner ("Owner") is effective March 22, 2010. This Agreement outlines facilitating acquisition, market analysis, foreclosure process, wholesales, retails, repairs, management duties.

LAMC is engaging in a business relationship with Portfolio Owner. To provide access to distressed Real Estate assets in various stages of non-performance. LAMC will provide disposition solution services of the assets for the Portfolio Owner.  Portfolio Owner recognizes the necessity of the services provided by LAMC to obtain investment capital and profits. LAMC and Portfolio Owner will share in the profits for LAMC's access and disposition expertise and services.

WHEREAS, the Portfolio Owner's LLC. is a common fund for distressed real estate-related portfolio ("Real Estate Investments") for distressed real estate assets. Portfolio Owner has determined to purchase distressed assets through LAMC established relationships.

Portfolio Owner will be purchasing distressed assets through LAMC. Portfolio Owner will become the distressed asset portfolio owners. LAMC will process the distressed asset portfolio through foreclosure process and wholesale and/or retail sale channels for maximum profit. Portfolio Owner will reimburse LAMC through close of escrow for providing portfolio management of the distressed assets and disposition services and will advance all fees necessary for managing the portfolio which includes property maintenance / clean-up, appraisal / BPO, property insurance, property taxes, legal fees, administrative fees, cost of restoring the property to saleable condition, and cost of sale.

Portfolio Owner is duly organized, validly existing and in good standing under the laws of the state of California to provide the services set forth in this Agreement with respect to the analysis, acquisition, management and disposition by the Portfolio Owner of interests in real property.

The Portfolio Owner and LAMC will be working together to maximize profits of the distressed real estate asset portfolio and each party acknowledges they are duly organized, validly existing and in good standing under the laws of the State of its organization and with full power and authority to execute, deliver and perform this Agreement and to enter into and consummate the transactions contemplated by this Agreement.  Portfolio Owner is duly qualified and in good standing in all jurisdictions where it is required to be qualified, except where the failure to be qualified is not material.  Portfolio Owner has taken all action required to authorize its execution, delivery and performance of this Agreement.  Below is the contact person for each entity that has the authorization to discuss details regarding the distressed asset portfolio(s).

LAMC CONTACT:

Audra Martin

Vice President of Portfolio Division

Phone:   626-214-2154

Address: 3218 E. Holt Avenue #212, West Covina, CA  91791

PORTFOLIO OWNER CONTACT:

Name: _____

Title: _____

Phone: _____

Address: _____

NOW THEREFORE, the parties hereto hereby agree as follows:

1. Appointment: the Portfolio Owner hereby appoints LAMC as the company that provides solutions to the distressed real estate asset portfolio.

2. General Engagement: Portfolio Owner appoints LAMC as the exclusive Asset Manager to provide the services set forth in this Agreement relating to the administration, management, supervision and disposition of the distressed assets described in Schedule 1 (the "Assets" and each an "Asset"). Additional Assets may be brought within the scope of this Agreement by a supplement to Schedule 1 signed by the parties. LAMC shall in good faith provide the services set forth in this Agreement in accordance with normal and prudent practices in the real estate industry and shall have the authority to take all actions necessary or appropriate to fulfill its obligations. This contract and described assets in Schedule 1 will be in effect for 24 months.  In case of early termination of this contract, Asset Manager is entitled to management fees based on initial portfolio acquisition purchase price as stated in section 19.

3. Services:

   (a) LAMC shall complete all appropriate and necessary due diligence services, negotiations and transaction documentation to effect the acquisition.

   (b) On completion of negotiations and documentation, LAMC shall present a recommendation to the Portfolio Owner on acquisition pricing.  Upon the Portfolio Owners approval of the recommendation, LAMC shall cause the investment transaction to be consummated.

   (c) LAMC shall manage assets for the Portfolio Owner with respect to distressed real estate portfolio now in the Limited Liability Company they committed to fund on behalf of the Portfolio Owner.

   (d.) Scope of duties:

   PREAQUISITION:
   1. Detailed analysis of market conditions per neighborhood in which assets are located.
   2. Comparisons pulled from current market data to support true retail value.
   3. Individual property analysis performed.
   4. History of each property is researched on Multiple Listing Service Sites.
   5. Pricing conditions identified based on market demand.
   6. Inventory Data and Days on Market of all inventories in each region.
   7. Analysis of market data for properties in adjacent areas with NOD filings.

   PRE-MARKET:

   1. Identify Notes and its specific stage represented by seller.
   2. Pull preliminary title information – check all liens.
   3. Assign appropriate files to Short Sale Team:
      (I)      Full file pulled from current Short Sale Listing Agent.
      (II)     Lien holder(s) is(are) evaluated.
      (III)    Pull County and Legal records on Property and borrower(s).
      (IV)     Contact borrower(s) for loss mitigation packet update.
      (V)      Generate 30 day pricing.
      (VI)     Re-assign to listing office.
      (VII)    Offer review/acceptance & transmittal of counter and/or approval.
      (VIII)   Market analysis performed for Retail pricing.

   WHOLESALE AND/OR RETAIL OPERATION:

   REO Foreclosure Department-

   Assigns Approved Realtor with the following duties:

   Asses' physical property; provides confirmation of assignment and occupancy status within 24-48 hours.

   If property is vacant and accessible, complete an interior BPO along with photo addendum and checklist of damages within 72 hours.

   If personal property is discovered, take photos of all personal property plus provide an inventory. We do not disturb and/or remove anything from the premises. Post for 30 days a personal property notice and send a personal property letter by both certified and regular mail.

Re-key and secure property and decide what additional services will be needed. Appraisals, Repairs, and/or Maintenance.

If property is occupied, make direct contact with the occupant, negotiate move out agreements and provide a relocation agreement, move-out agreement and personal property release forms.
After agreements are signed and the move out date has arrived, inspect property to ensure all personal property is removed and property is in reasonably clean condition, release check to occupant, secure property, and begin the evaluation and remedial phases.

Property Evaluation:
1.   Insurance Loss Inspections.
2.   Natural Disaster Inspections.
3.   Board ups.
4.   Debris Removal.
5.   Winterization.
6.   Lawn Maintenance – recurring service.
7.   Pool Maintenance- fence around open pools.
8.   HOA – issues to resolve.
9.   Mold Inspection and removal.
10.  Vacant Property Registration.
11.  Code Violation remedies.
12.  Eviction.
13.  Obtain bids for repair(s).

Legal Department:
Handles all required legal documentation for-
1.   Short Sale.
2.   Cash for Keys.
3.   Trustees Sale at Courthouse.
4.   Bankruptcy filing from borrower.

Market Study Department:
1.   Property Valuation based on inspection reports and photographs.
2.   Review strategy and pricing every 30 days.
3.   Analyze general neighborhood marketing trends.

Property Management Department:
1.   Supervise repairs and maintenance.
2.   Monthly inspection reports.
3.   Select property management when applicable.
4.   Payment of property utilities.

Management:
1.   Assign local Agent per Listing agreement and list letter for marketing the property.
2.   Monitor "listed property activity status" ensuring activity meets standards.
3.   Issue list price reductions as applicable.
4.   Monitoring System.
5.   Provide Activity Reports tracking, showings, offer activity, all counter offers and general neighborhood marketing trends
6.   Provide offer acceptance review and transmittal of approval.
7.   Follow-up with agents on response day and continue to mandate required documentation:
       (I)       State Contract.
       (II)      Client Investor and Counter & Addendum.
       (III)     Disclosures.
       (IV)      Pre-approval/Pre-qualification letter or Proof of Funds.
       (V)   .  Copy of earnest check.

Review of all documentation:
1.   Review for accuracy, completeness and legibility.
2.   Sign and return with instructions to verify once forwarded to Escrow.
3.   Send introduction and closing instruction letter to closer requesting to verify.
Once they receive all documentation and earnest deposit, where applicable,
Require weekly
       (I)       Title commitment.
       (II)      Inspection completion and acceptance.
       (III)     Appraisal completion.
       (IV)      Loan Approval.
       (V)       Loan documents.
       (VI)      Execute closing documents.

Verify Settlement:
1. Ensure all transfers have occurred.
2. Submit detailed closed file.

Accounting Team:
1. Provide monthly reports on both a summary and Individual property basis regarding inventory flow, unsold inventory, properties under contract, sales and property expenses.
2. Provide end of year accounting.
3. Retain records for 5 years.

   (a) LAMC shall have management authority and full authorization for approving, appraisers, insurance agents and attorneys whose services are necessary or appropriate to the acquisition, ownership, development, operation and disposition of one or more of the Distressed Asset Portfolio(s), and Portfolio Owner shall pay such persons or entities under the terms of the agreements entered into by LAMC with such persons or entities in the name of the Portfolio Owner. LAMC shall select and employ on behalf of the Portfolio Owner agents, accountants, mortgage originators or servicers, lenders, technical advisors, brokers, leasing agents, underwriters, escrow agents, custodians, agents for collection, insurance agents, architects, engineers, construction consultants and managers, construction contractors and others whose services are necessary or appropriate to the acquisition, ownership, development, operation and disposition of one or more of the Distressed Asset Portfolio(s). Investor shall cause the Portfolio Owner to pay, as directed by LAMC, such persons or entities under the terms of the agreements entered into by LAMC with such persons or entities in the name of the Portfolio Owner.

   (b) With respect to the disposition of Distressed Asset Portfolio(s), LAMC shall provide such services and make such recommendations for all assets outlined in Schedule 1 and shall be primarily responsible for negotiating disposition agreements and for consummating approved dispositions LAMC shall have the sole authority to execute agreements therefore.

   (c) LAMC shall provide usual and customary real estate asset management services in respect of the properties held by the Portfolio Owner as Distressed Asset Portfolio(s), including, among other services, the sales and execution of selling agreements on the properties, the retention of Property Management firms, and such other usual and customary real estate asset disposition and management services as are normally provided by LAMC in respect of distressed asset portfolio(s) similar to the Portfolio Owner. LAMC shall provide such asset management services in respect of all Real Estate Investments in the Portfolio Owner's LLC, including Distressed Asset Portfolio(s) acquired by the Portfolio Owner

   (d) LAMC shall maintain appropriate records of the Distressed Asset Portfolio(s) and of LAMC's activities under this Agreement, which records shall be open to inspection by Investor or its authorized representatives at LAMC's office during normal business hours. LAMC shall also prepare such periodic reports of its activities and the Distressed Asset Portfolio(s) as Investor may reasonably request.

   (e) LAMC shall, from time to time, present to Investor for its consideration distressed ssset portfolio(s) which, based upon LAMC preliminary investigation, is(are) determined by LAMC in good faith to meet the requirements of and to present an appropriate investment opportunity for the Portfolio Owner

4. The Portfolio Owner will provide the financing for the acquisition of distressed assets and will keep funds in circulation for 24 months. Investor is responsible for all coordination of funds and has their own accounting and tax advisors throughout the entire process from acquisition to disposition of the assets.

5. At the time assets are identified, investor will have funds in appropriate accounts to ensure timely funding requirements. Portfolio Owner with LAMC advisement will have funds ready to wire in 48 hours after acceptance of distressed asset portfolio.

6. The Portfolio Owner ensures LAMC it has not received it funds from fraudulent activity and has abided by State and Federal laws in accordance to how funds should be properly set-up for the acquisition of assets to be purchased.

7. Furnishing Information to LAMC: Portfolio Owner will keep LAMC informed with regard to the Distressed Asset Portfolio(s) owned by the Portfolio Owner and the funds available or expected to be available for investment by the Portfolio Owner. Upon request, Portfolio Owner will provide LAMC any additional information as necessary and appropriate for the purpose of LAMC performing their functions.

8.  Custody of assets: Portfolio Owner shall have authority to retain copies of any assets or any instruments. All assets of the Portfolio Owner and all instruments evidencing the ownership of investments of the Portfolio Owner and originals of all documents which are necessary for LAMC to hold on behalf of the Portfolio Owner to exercise their rights or remedies with respect to the assets of the Portfolio Owner, including, but not limited to, all notes, mortgages, deeds, leases, certificates, title policies, assignments, legal opinions, bills of sale and indemnities, shall be held by LAMC, which shall be responsible for all asset management arrangements with respect thereto. All payments, distributions, and other transactions in cash or securities, whether with respect to the Portfolio Owner or the assets thereof (including, without limitation, any rents or mortgage payments or receipts) shall be made directly to or from Investor and/or LAMC. Portfolio Owner is obligated to maintain their own records required for any reimbursements set forth in the Portfolio Owner agreement to offset profit splits. Investor represents that it is an experienced Investor and has his or her own accounting and legal professional advisors who can provide Investor with the necessary support for all transactions engaged in with LAMC.

9.  Compliance with Laws, Regulations, Codes, Etcetera: LAMC shall perform its duties and responsibilities under this Agreement in accordance with, and will be limited in the exercise of its rights by, the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") and all other applicable federal, state and local laws, ordinances, codes or regulations applicable to its duties and responsibilities, including without limitation identifying the appropriate required permits, certificates, approvals and inspections. If a charge of noncompliance with respect to any such laws, regulations or ordinances is brought against LAMC, it shall promptly notify Investor of such charge in writing.

10. Confidentiality: LAMC and Portfolio Owner each agree that any information provided it or its employees by the other party or by persons acting for or on behalf of the other party concerning such other party or the Portfolio Owner and which is not public information shall be treated as proprietary and confidential by the recipient and its employees. Such information shall not be divulged to any party except as described in the next sentence or used for any purpose other than for the management and administration of the LLC or the performances required by this Agreement. Each party and its employees may, in good faith, divulge factual information of the type described in this paragraph to regulatory authorities and the Investment plans. Portfolio Owner shall keep LAMC informed on a current basis, of information being communicated and divulged about the Investment plan, without regard to whether such information is proprietary and confidential as described in this subsection. The provisions of this subsection regarding confidentiality shall survive the termination or expiration of this Agreement.

11. Nothing herein shall preclude from LAMC communicating any information or concerns to Investment Plans or potential Investment Plans relating to the Portfolio Owner that LAMC reasonably and in good faith believes is required or appropriate to be disclosed to Investment Plans or potential Investment Plans by applicable law, the terms of the Declaration, or that is material or important information that is required or appropriate to be disclosed to an investor in the Portfolio Owner under principles of good faith and fair dealing with investors, and no such communications shall be deemed to violate this Section 8. LAMC's proprietary Investment Plans can be utilized by other Investors that LAMC is in similar partnerships with or for LAMC's sole Investment Plans.

12  Other Business of LAMC: Nothing in this Agreement shall be construed to restrict the right of LAMC or its affiliates to act and continue to act as investors, investment managers, advisors, partners or asset managers for other clients, nor shall this Agreement be deemed to restrict in any way the freedom of LAMC or its affiliates to conduct any other business venture of any nature or to make investments for its investment account or the investment accounts of any other person or entity.

13. Liability and Indemnification: LAMC, its officers and its employees will not be liable to Investor (whether on a tort, breach of contract or other theory) for investment advice or acts or omissions under or pursuant to this Agreement or for the acts or omissions of Investor in the management of the Portfolio Owner, and Investor shall indemnify and save harmless LAMC, its officers and employees from and against any and all claims asserted against them arising from any such investment advice, acts or omissions, including all attorney's fees and other expenses reasonably incurred in the defense of any such claim unless (a) such act or omission for which exculpation or indemnification is sought constituted a breach of this Agreement, bad faith, willful misfeasance, negligence or reckless disregard by LAMC of its duties in the performance of services under this Agreement, or in Portfolio Owner with respect to any such act or omission for which exculpation or indemnification was sought, LAMC is a managing partner to the Portfolio Owner, such act or omission was a violation of the duties imposed upon LAMC as a partner under Portfolio Owner (except to the extent that liability arises derivatively from the acts or omissions of Investor) or a violation of any other federal or state law applicable to LAMC. LAMC shall indemnify and save harmless Investor from and against any and all claims, including all attorneys' fees and other expenses reasonably incurred in the defense of any claim, asserted against Investor by reason of any act or omission of LAMC that (a) constituted a breach of this Agreement, bad faith, willful misfeasance, negligence or reckless disregard of its duties in the performance of services under

this Agreement; or (b) constituted a violation of the duties imposed upon LAMC as a managing partner under Portfolio Owner (except to the extent that liability arises derivatively from the acts or omissions of Riggs) or a violation of any other federal or state law applicable to LAMC. The provisions of this paragraph shall survive a termination or expiration of this Agreement.

14. Assignment: This Agreement shall not be assignable by Portfolio Owner or LAMC without the written consent of either party, provided that no consent shall be necessary in the case of a merger, acquisition or reorganization. LAMC warrants that, in the event of an acquisition, merger or reorganization of LAMC, there will be no material changes to the nature or quality of the services provided by LAMC to Investor and that continuity and quality of services provided by LAMC to the Portfolio Owner will be preserved either by retaining senior personnel in place as of the effective date of this Agreement or replacing them with a sufficient number of individuals with comparable skill and experience in relevant disciplines. To the extent permitted by law, the assigning party shall provide notice to the other not less than sixty (60) days in advance of such assignment or a shorter period of notice as the parties may agree upon; except that Investor Acknowledgments, Representations and Warranties of LAMC: With the understanding that Investor intends to rely on these representations, LAMC represents and agrees that

(a)   In providing the services described in this Agreement, LAMC shall exercise the degree of care consistent with that of qualified professional investment advisers & asset managers in relating to the same or similar kinds of investments and managements and shall conduct itself in a manner consistent with the managing partner responsibility requirements of the Portfolio Owner.

(b)   The personnel of LAMC who will be responsible for carrying out this Agreement are individuals experienced in the making of distressed asset portfolio(s) of the nature contemplated by this Agreement and are also experienced in the performance of the various functions contemplated by this Agreement.

(c)   LAMC shall promptly notify Investor in the event of any change in control of LAMC or if LAMC or any affiliate of LAMC is the subject of proceedings properly commenced under any chapter of the Bankruptcy Act, is the subject of liquidation or insolvency proceedings properly commenced by a regulatory agency with jurisdiction to liquidate the business and affairs of a party; is adjudged insolvent in any proceeding commenced in any court of competent jurisdiction for the appointment of a receiver, liquidator or trustee; makes a general assignment for the benefit of creditors; or admits in writing its inability to pay its debts as they come due.

15. Representations of Portfolio Owner: With the understanding that LAMC intends to rely upon these representations, Portfolio Owner represents, warrants and agrees that: (i) it is the sole investor or manager to investors of the Portfolio Owner; (ii) LAMC has been duly appointed by Investor to provide investment management (iii) Investor has delivered a true and correct copy of the Management Agreement and any amendments there o as may be adopted from time to time to LAMC for convenience of reference, but the rights, powers and duties of LAMC shall be governed solely by the terms of this Agreement without reference to the terms of the Management Agreement.

(a)   This Agreement (including the exhibits, other addenda, if any, and documents incorporated by reference, if any) constitutes the entire Agreement between the parties with respect to its subject matter, and supersedes all prior agreements, proposals, negotiations and other written or oral communications between the parties with respect to the subject matter of this Agreement. No waiver of any breach of this Agreement, and no course of dealing between the parties, shall be construed as a waiver of any subsequent breach of this Agreement. Except as expressly provided herein, this Agreement may be modified only if such modifications are in writing and signed by the parties hereto.

(b)   If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be held contrary to any express provision of law or contrary to the policy of express law, though not expressly prohibited, or against public policy, or shall for any reason whatsoever be held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or the rights of the parties hereto. Section headings are for convenience of reference only and shall not affect the interpretation of this Agreement.

(d)   This Agreement shall be administered, construed and enforced in accordance with the laws of the County of Los Angels in the State of California as if the Agreement were executed and performed entirely therein to the extent such laws have not been preempted by applicable Federal law.

(e) This Agreement may be executed in any manner of separate counterparts, each of which shall together be deemed an original, but the several counterparts shall together constitute but one and the same Agreement of the parties hereto.

16. Expenses of LAMC: LAMC shall bear all of its internal costs and expenses in connection with the performance of its services hereunder, including, but not limited to: employees' salaries; travel; lodging while in a travel status; office overhead (including long distance telephone charges); insurance (other than insurance of Distressed Asset Portfolio); taxes levied on LAMC and its operations and income; and legal, accounting and other professional fees associated with LAMC internal affairs (but not fees of such professionals incurred directly with respect to a particular Distressed Asset Portfolio(s), whether or not such Distressed Asset Portfolio(s) is(are) in fact acquired by the Portfolio Owner). The intent of this paragraph is that LAMC shall be reimbursed for all fees excluding staffing.

17. LAMC will charge a management fee according to one of the two following programs for its service.

   If portfolio size is below $6,000,000.00, then
   (a) Guarantee 20% net return on each individual property of the entire portfolio outlined in Schedule 1. The net return is calculated on individual property basis. The LAMC will be responsible for the difference, if the net return is below 20%. If the net return is above 20% and less than 40%, the LAMC management fee will be remaining amount above the 20% net return. If the net return is above 40%, the LAMC management fee will be 50% of the net proceed.

   If portfolio size is $6,000,000.00 or above, then
   (b) Guarantee 20% net return on each individual property of the entire portfolio outlined in Schedule 1. The net return is calculated on individual property basis. The LAMC will be responsible for difference, if the net return is below 20%. If the net return is above 20%, the LAMC management fee will be 50% of the remaining amount after the 20% net proceed.

18. Portfolio Owner agrees that it will have initial funds for the acquisition of portfolio in Appendix A - for 24 months profits from the funds can be added to the Portfolio Owner or it may choose to take profits at the close of each property transaction.

19. Early termination before the 24 months when funds are utilized for the initial portfolio, LAMC will charge an early termination fee equivalent to 10% of the acquisition purchase price of the remaining portfolio(s).

20. Portfolio Owner and Liberty will execute specific escrow instructions outlining distribution structure after all property fees are deducted for each property on an individual transactional basis. Prior to Grant Deed being executed by appointed Portfolio Owner or LAMC if Portfolio Owner chooses to appoint LAMC signature authority. Escrow instructions (see Exhibit B for details) with distribution of the net proceeds for each property of the entire portfolio will be provided and signed by both parties along with this agreement.

21. Portfolio Owner understands that after execution of this agreement LAMC will pursue a distressed asset portfolio to be purchased by Portfolio Owner that LAMC will assist in the acquisition and will manage the portfolio through the disposition stages until all assets are liquidated and will continue the process for 24 months utilizing funds provided by Portfolio Owner.

22. Portfolio Owners assets purchased through the portfolio will have the ability to continue to remain in contract, exchange, or sell asset to LAMC at acquisition price if the following occurs after the first six months: No offers have been received, an offer is not currently being negotiated, escrow has not been opened.

| Liberty Asset Management Corporation | Portfolio Owner |
| --- | --- |
| | JD Brothers _____ LLC |
| _____ ) 03-22-10 | _____ 03/22/10 |
| Asset Manager            Date | Title            Date |
| _____ 03-24-10 | _____ _____ |
| Portfolio Operation Manager   Date | Title            Date |
| | _____ _____ |
| | Title            Date |

# EXHIBIT 13



# Liberty Asset Management Corporation

## Distressed Property Portfolio Retail Management Agreement

Distressed Property Portfolio Retail Management Agreement ("Agreement") by and between Liberty Asset Management Inc., ("LAMC") and Portfolio Owner ("Owner") is effective <u>July 21, 2013</u>. This Agreement outlines facilitating acquisition, market analysis, foreclosure process, wholesales, retails, repair, and management duties.

LAMC is engaging in a business relationship with Portfolio Owner. To provide access to distressed Real Estate assets in various stages of non-performance. LAMC will provide disposition solution services of the assets for the Portfolio Owner. Portfolio Owner recognizes the necessity of the services provided by LAMC to obtain investment capital and profits. LAMC and Portfolio Owner will share in the profits for LAMC's access and disposition expertise and services.

　　WHEREAS, the Portfolio Owner's LLC. is a common fund for distressed real estate-related portfolio ("Real Estate Investments") for distressed real estate assets. Portfolio Owner has determined to purchase distressed assets through LAMC established relationships.

Portfolio Owner will be purchasing distressed assets through LAMC. Portfolio Owner will become the distressed asset portfolio owners. LAMC will process the distressed asset portfolio through foreclosure process and wholesale and/or retail sale channels for maximum profit. Portfolio Owner will reimburse LAMC through close of escrow for providing portfolio management of the distressed assets and disposition services and will advance all fees necessary for managing the portfolio which includes property maintenance / clean-up, appraisal / BPO, property insurance, property taxes, legal fees, administrative fees, cost of restoring the property to saleable condition, and cost of sale.

Portfolio Owner is duly organized, validly existing and in good standing under the laws of the state of California to provide the services set forth in this Agreement with respect to the analysis, acquisition, management and disposition by the Portfolio Owner of interests in real property.

The Portfolio Owner and LAMC will be working together to maximize profits of the distressed real estate asset portfolio and each party acknowledges they are duly organized, validly existing and in good standing under the laws of the State of its organization and with full power and authority to execute, deliver and perform this Agreement and to enter into and consummate the transactions contemplated by this Agreement. Portfolio Owner is duly qualified and in good standing in all jurisdictions where it is required to be qualified, except where the failure to be qualified is not material. Portfolio Owner has taken all action required to authorize its execution, delivery and performance of this Agreement. Below is the contact person for each entity that has the authorization to discuss details regarding the distressed asset portfolio(s).

LAMC CONTACT:

Vanessa Lavendera

Vice President of Portfolio Division

Phone:　626-214-2154

Address:　3218 E. Holt Avenue #212, West Covina, CA  91791

PORTFOLIO OWNER CONTACT:

Name: _____

Title: _*Power Attorney in fact*_

Phone:_____

Address:_____

NOW THEREFORE, the parties hereto hereby agree as follows:

1. Appointment: the Portfolio Owner hereby appoints LAMC as the company that provides solutions to the distressed real estate asset portfolio.

2. General Engagement: Portfolio Owner appoints LAMC as the exclusive Asset Manager to provide the services set forth in this Agreement relating to the administration, management, supervision and disposition of the distressed assets described in Schedule 1 (the "Assets" and each an "Asset"). Additional Assets may be brought within the scope of this Agreement by a supplement to Schedule 1 signed by the parties. LAMC shall in good faith provide the services set forth in this Agreement in accordance with normal and prudent practices in the real estate industry and shall have the authority to take all actions necessary or appropriate to fulfill its obligations.  This contract and described assets in Schedule 1 will be in effect for 24 months.  In case of early termination of this contract, Asset Manager is entitled to management fees based on initial portfolio acquisition purchase price as stated in section 19.

3. Services:

    (a) LAMC shall complete all appropriate and necessary due diligence services, negotiations and transaction documentation to effect the acquisition.

    (b) On completion of negotiations and documentation, LAMC shall present a recommendation to the Portfolio Owner on acquisition pricing.  Upon the Portfolio Owners approval of the recommendation, LAMC shall cause the investment transaction to be consummated.

    (c) LAMC shall manage assets for the Portfolio Owner with respect to distressed real estate   portfolio now in the Limited Liability Company they committed to fund on behalf of the Portfolio Owner.

    (d.) Scope of duties:

    PREAQUISITION:
    1. Detailed analysis of market conditions per neighborhood in which assets are located.
    2. Comparisons pulled from current market data to support true retail value.
    3. Individual property analysis performed.
    4. History of each property is researched on Multiple Listing Service Sites.
    5. Pricing conditions identified based on market demand.
    6. Inventory Data and Days on Market of all inventories in each region.
    7. Analysis of market data for properties in adjacent areas with NOD filings.

    PRE-MARKET:
    1. Identify Notes and its specific stage represented by seller.
    2. Pull preliminary title information – check all liens.
    3. Assign appropriate files to Short Sale Team:
        (I)     Full file pulled from current Short Sale Listing Agent.
        (II)    Lien holder(s) is(are) evaluated.
        (III)   Pull County and Legal records on Property and borrower(s).
        (IV)    Contact borrower(s) for loss mitigation packet update.
        (V)     Generate 30 day pricing.
        (VI)    Re-assign to listing office.
        (VII)   Offer review/acceptance & transmittal of counter and/or approval.
        (VIII)  Market analysis performed for Retail pricing.

    WHOLESALE AND/OR RETAIL OPERATION:

    REO Foreclosure Department-

    Assigns Approved Realtor with the following duties:

    Asses' physical property; provides confirmation of assignment and occupancy status within 24-48 hours.

    If property is vacant and accessible, complete an interior BPO along with photo addendum and checklist of damages within 72 hours.

    If personal property is discovered, take photos of all personal property plus provide an inventory. We do not disturb and/or remove anything from the premises. Post for 30 days a personal property notice and send a personal property letter by both certified and regular mail.

Re-key and secure property and decide what additional services will be needed. Appraisals, Repairs, and/or Maintenance.

If property is occupied, make direct contact with the occupant, negotiate move out agreements and provide a relocation agreement, move-out agreement and personal property release forms.
After agreements are signed and the move out date has arrived, inspect property to ensure all personal property is removed and property is in reasonably clean condition, release check to occupant, secure property, and begin the evaluation and remedial phases.

Property Evaluation:
1.  Insurance Loss Inspections.
2.  Natural Disaster Inspections.
3.  Board ups.
4.  Debris Removal.
5.  Winterization.
6.  Lawn Maintenance – recur
7.  ring service.
8.  Pool Maintenance- fence around open pools.
9.  HOA – issues to resolve.
10. Mold Inspection and removal.
11. Vacant Property Registration.
12. Code Violation remedies.
13. Eviction.
14. Obtain bids for repair(s).

Legal Department:
Handles all required legal documentation for-
1.  Short Sale.
2.  Cash for Keys.
3.  Trustees Sale at Courthouse.
4.  Bankruptcy filing from borrower.

Market Study Department:
1.  Property Valuation based on inspection reports and photographs.
2.  Review strategy and pricing every 30 days.
3.  Analyze general neighborhood marketing trends.

Property Management Department:
1.  Supervise repairs and maintenance.
2.  Monthly inspection reports.
3.  Select property management when applicable.
4.  Payment of property utilities.

Management:
1.  Assign local Agent per Listing agreement and list letter for marketing the property.
2.  Monitor "listed property activity status" ensuring activity meets standards.
3.  Issue list price reductions as applicable.
4.  Monitoring System.
5.  Provide Activity Reports tracking, showings, offer activity, all counter offers and general neighborhood marketing trends
6.  Provide offer acceptance review and transmittal of approval.
7.  Follow-up with agents on response day and continue to mandate required documentation:
    (I)     State Contract.
    (II)    Client Investor and Counter & Addendum.
    (III)   Disclosures.
    (IV)    Pre-approval/Pre-qualification letter or Proof of Funds.
    (V)     Copy of earnest check.

Review of all documentation:
1.  Review for accuracy, completeness and legibility.
2.  Sign and return with instructions to verify once forwarded to Escrow.
3.  Send introduction and closing instruction letter to closer requesting to verify.
Once they receive all documentation and earnest deposit, where applicable,
Require weekly
    (I)     Title commitment.
    (II)    Inspection completion and acceptance.
    (III)   Appraisal completion.
    (IV)    Loan Approval.
    (V)     Loan documents.
    (VI)    Execute closing documents.

Verify Settlement:
1. Ensure all transfers have occurred.
2. Submit detailed closed file.

Accounting Team:
1. Provide monthly reports on both a summary and individual property basis regarding inventory flow, unsold inventory, properties under contract, sales and property expenses.
2. Provide end of year accounting.
3. Retain records for 5 years.

    (e) LAMC shall have management authority and full authorization for approving, appraisers, insurance agents and attorneys whose services are necessary or appropriate to the acquisition, ownership, development, operation and disposition of one or more of the Distressed Asset Portfolio(s), and Portfolio Owner shall pay such persons or entities under the terms of the agreements entered into by LAMC with such persons or entities in the name of the Portfolio Owner. LAMC shall select and employ on behalf of the Portfolio Owner agents, accountants, mortgage originators or servicers, lenders, technical advisors, brokers, leasing agents, underwriters, escrow agents, custodians, agents for collection, insurance agents, architects, engineers, construction consultants and managers, construction contractors and others whose services are necessary or appropriate to the acquisition, ownership, development, operation and disposition of one or more of the Distressed Asset Portfolio(s). Investor shall cause the Portfolio Owner to pay, as directed by LAMC, such persons or entities under the terms of the agreements entered into by LAMC with such persons or entities in the name of the Portfolio Owner.

    (f) With respect to the disposition of Distressed Asset Portfolio(s), LAMC shall provide such services and make such recommendations for all assets outlined in Schedule 1 and shall be primarily responsible for negotiating disposition agreements and for consummating approved dispositions LAMC shall have the sole authority to execute agreements therefore.

    (g) LAMC shall provide usual and customary real estate asset management services in respect of the properties held by the Portfolio Owner as Distressed Asset Portfolio(s), including, among other services, the sales and execution of selling agreements on the properties, the retention of Property Management firms, and such other usual and customary real estate asset disposition and management services as are normally provided by LAMC in respect of distressed asset portfolio(s) similar to the Portfolio Owner. LAMC shall provide such asset management services in respect of all Real Estate Investments in the Portfolio Owner's LLC, including Distressed Asset Portfolio(s) acquired by the Portfolio Owner

    (h) LAMC shall maintain appropriate records of the Distressed Asset Portfolio(s) and of LAMC's activities under this Agreement, which records shall be open to inspection by Investor or its authorized representatives at LAMC's office during normal business hours. LAMC shall also prepare such periodic reports of its activities and the Distressed Asset Portfolio(s) as Investor may reasonably request.

    (i) LAMC shall, from time to time, present to Investor for its consideration distressed ssset portfolio(s) which, based upon LAMC preliminary investigation, is(are) determined by LAMC in good faith to meet the requirements of and to present an appropriate investment opportunity for the Portfolio Owner

4. The Portfolio Owner will provide the financing for the acquisition of distressed assets and will keep funds in circulation for 24 months.  Investor is responsible for all coordination of funds and has their own accounting and tax advisors throughout the entire process from acquisition to disposition of the assets.

5. At the time assets are identified, Investor will have funds in appropriate accounts to ensure timely funding requirements.  Portfolio Owner with LAMC advisement will have funds ready to wire in 48 hours after acceptance of distressed asset portfolio.

6. The Portfolio Owner ensures LAMC it has not received it funds from fraudulent activity and has abided by State and Federal laws in accordance to how funds should be properly set-up for the acquisition of assets to be purchased.

7. Furnishing Information to LAMC:  Portfolio Owner will keep LAMC informed with regard to the Distressed Asset Portfolio(s) owned by the Portfolio Owner and the funds available or expected to be available for investment by the Portfolio Owner. Upon request, Portfolio Owner will provide LAMC any additional information as necessary and appropriate for the purpose of LAMC performing their functions.

8. Custody of assets: Portfolio Owner shall have authority to retain copies of any assets or any instruments. All assets of the Portfolio Owner and all instruments evidencing the ownership of Investments of the Portfolio Owner and originals of all documents which are necessary for LAMC to hold on behalf of the Portfolio Owner to exercise their rights or remedies with respect to the assets of the Portfolio Owner, including, but not limited to, all notes, mortgages, deeds, leases, certificates, title policies, assignments, legal opinions, bills of sale and indemnities, shall be held by LAMC, which shall be responsible for all asset management arrangements with respect thereto. All payments, distributions, and other transactions in cash or securities, whether with respect to the Portfolio Owner or the assets thereof (including, without limitation, any rents or mortgage payments or receipts) shall be made directly to or from Investor and/or LAMC. Portfolio Owner is obligated to maintain their own records required for any reimbursements set forth in the Portfolio Owner agreement to offset profit splits. Investor represents that it is an experienced Investor and has his or her own accounting and legal professional advisors who can provide Investor with the necessary support for all transactions engaged in with LAMC.

9. Compliance with Laws, Regulations, Codes, Etcetera: LAMC shall perform its duties and    responsibilities under this Agreement in accordance with, and will be limited in the exercise of its rights by, the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") and all other applicable federal, state and local laws, ordinances, codes or regulations applicable to its duties and responsibilities, including without limitation identifying the appropriate required permits, certificates, approvals and inspections. If a charge of noncompliance with respect to any such laws, regulations or ordinances is brought against LAMC, it shall promptly notify Investor of such charge in writing.

10. Confidentiality: LAMC and Portfolio Owner each agree that any information provided it or its employees by the other party or by persons acting for or on behalf of the other party concerning such other party or the Portfolio Owner and which is not public information shall be treated as proprietary and confidential by the recipient and its employees. Such information shall not be divulged to any party except as described in the next sentence or used for any purpose other than for the management and administration of the LLC or the performances required by this Agreement. Each party and its employees may, in good faith, divulge factual information of the type described in this paragraph to regulatory authorities and the Investment plans. Portfolio Owner shall keep LAMC informed on a current basis, of information being communicated and divulged about the Investment plan, without regard to whether such information is proprietary and confidential as described in this subsection. The provisions of this subsection regarding confidentiality shall survive the termination or expiration of this Agreement.

11. Nothing herein shall preclude from LAMC communicating any information or concerns to Investment Plans or potential Investment Plans relating to the Portfolio Owner that LAMC reasonably and in good faith believes is required or appropriate to be disclosed to Investment Plans or potential Investment Plans by applicable law, the terms of the Declaration, or that is material or important information that is required or appropriate to be disclosed to an Investor in the Portfolio Owner under principles of good faith and fair dealing with investors, and no such communications shall be deemed to violate this Section 8. LAMC's proprietary Investment Plans can be utilized by other Investors that LAMC is in similar partnerships with or for LAMC's sole Investment Plans.

12 Other Business of LAMC: Nothing in this Agreement shall be construed to restrict the right of LAMC or its affiliates to act and continue to act as investors, investment managers, advisors, partners or asset managers for other clients, nor shall this Agreement be deemed to restrict in any way the freedom of LAMC or its affiliates to conduct any other business venture of any nature or to make investments for its investment account or the investment accounts of any other person or entity.

13. Liability and Indemnification: LAMC, its officers and its employees will not be liable to Investor (whether on a tort, breach of contract or other theory) for investment advice or acts or omissions under or pursuant to this Agreement or for the acts or omissions of Investor in the management of the Portfolio Owner, and Investor shall indemnify and save harmless LAMC, its officers and employees from and against any and all claims asserted against them arising from any such investment advice, acts or omissions, including any attorney's fees and other expenses reasonably incurred in the defense of any such claim unless (a) such act or omission for which exculpation or indemnification is sought constituted a breach of this Agreement, bad faith, willful misfeasance, negligence or reckless disregard by LAMC of its duties in the performance of services under this Agreement, or in Portfolio Owner with respect to any such act or omission for which exculpation or indemnification was sought, LAMC is a managing partner to the Portfolio Owner, such act or omission was a violation of the duties imposed upon LAMC as a partner under Portfolio Owner (except to the extent that liability arises derivatively from the acts or omissions of Investor) or a violation of any other federal or state law applicable to LAMC.  LAMC shall indemnify and save harmless Investor from and against any and all claims, including all attorneys' fees and other expenses reasonably incurred in the defense of any claim, asserted against Investor by reason of any act or omission of LAMC that (a) constituted a breach of this Agreement, bad faith, willful misfeasance, negligence or reckless disregard of its duties in the performance of services under this Agreement; or (b) constituted a violation of the duties imposed upon LAMC as a managing partner under Portfolio Owner (except to the extent that liability arises derivatively from the acts or omissions of Riggs) or a violation of any other federal or state law applicable to LAMC. The provisions of this paragraph shall survive a termination or expiration of this Agreement.

14. **Assignment:** This Agreement shall not be assignable by Portfolio Owner or LAMC without the written consent of either party, provided that no consent shall be necessary in the case of a merger, acquisition or reorganization. LAMC warrants that, in the event of an acquisition, merger or reorganization of LAMC, there will be no material changes to the nature or quality of the services provided by LAMC to Investor and that continuity and quality of services provided by LAMC to the Portfolio Owner will be preserved either by retaining senior personnel in place as of the effective date of this Agreement or replacing them with a sufficient number of individuals with comparable skill and experience in relevant disciplines. To the extent permitted by law, the assigning party shall provide notice to the other not less than sixty (60) days in advance of such assignment or a shorter period of notice as the parties may agree upon; except that Investor Acknowledgments, Representations and Warranties of LAMC: With the understanding that Investor intends to rely on these representations, LAMC represents and agrees that

   (a)   In providing the services described in this Agreement, LAMC shall exercise the degree of care consistent with that of qualified professional investment advisers & asset managers in relating to the same or similar kinds of investments and managements and shall conduct itself in a manner consistent with the managing partner responsibility requirements of the Portfolio Owner.

   (b)   The personnel of LAMC who will be responsible for carrying out this Agreement are individuals experienced in the making of distressed asset portfolio(s) of the nature contemplated by this Agreement and are also experienced in the performance of the various functions contemplated by this Agreement.

   (c)   LAMC shall promptly notify Investor in the event of any change in control of LAMC or if LAMC or any affiliate of LAMC is the subject of proceedings properly commenced under any chapter of the Bankruptcy Act, is the subject of liquidation or insolvency proceedings properly commenced by a regulatory agency with jurisdiction to liquidate the business and affairs of a party; is adjudged insolvent in any proceeding commenced in any court of competent jurisdiction for the appointment of a receiver, liquidator or trustee; makes a general assignment for the benefit of creditors; or admits in writing its inability to pay its debts as they come due.

15. **Representations of Portfolio Owner:** With the understanding that LAMC intends to rely upon these representations, Portfolio Owner represents, warrants and agrees that: (i) it is the sole investor or manager to Investors of the Portfolio Owner; (ii) LAMC has been duly appointed by Investor to provide investment management (iii) Investor has delivered a true and correct copy of the Management Agreement and any amendments there o as may be adopted from time to time to LAMC for convenience of reference, but the rights, powers and duties of LAMC shall be governed solely by the terms of this Agreement without reference to the terms of the Management Agreement.

   (a)   This Agreement (including the exhibits, other addenda, if any, and documents incorporated by reference, if any) constitutes the entire Agreement between the parties with respect to its subject matter, and supersedes all prior agreements, proposals, negotiations and other written or oral communications between the parties with respect to the subject matter of this Agreement. No waiver of any breach of this Agreement, and no course of dealing between the parties, shall be construed as a waiver of any subsequent breach of this Agreement. Except as expressly provided herein, this Agreement may be modified only if such modifications are in writing and signed by the parties hereto.

   (b)   If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be held contrary to any express provision of law or contrary to the policy of express law, though not expressly prohibited, or against public policy, or shall for any reason whatsoever be held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or the rights of the parties hereto. Section headings are for convenience of reference only and shall not affect the interpretation of this Agreement.

   (d)   This Agreement shall be administered, construed and enforced in accordance with the laws of the County of Los Angels in the State of California as if the Agreement were executed and performed entirely therein to the extent such laws have not been preempted by applicable Federal law.

   (e)   This Agreement may be executed in any manner of separate counterparts, each of which shall together be deemed an original, but the several counterparts shall together constitute but one and the same Agreement of the parties hereto.

16. **Expenses of LAMC:** LAMC shall bear all of its internal costs and expenses in connection with the performance of its services hereunder, including, but not limited to: employees' salaries; travel; lodging while in a travel status; office overhead (including long distance telephone charges); insurance (other than insurance of Distressed Asset Portfolio); taxes levied on LAMC and its operations and income; and legal, accounting and other professional fees associated with LAMC internal affairs (but not fees of such professionals incurred directly

with respect to a particular Distressed Asset Portfolio(s), whether or not such Distressed Asset Portfolio(s) is(are) in fact acquired by the Portfolio Owner). The intent of this paragraph is that LAMC shall be reimbursed for all fees excluding staffing.

17. **LAMC will charge management fee according to the following programs for its services. The portfolio size is $3,600,000.00 (Three Million Six Hundred Thousand Dollars). LAMC guarantee ANNUAL 5% net return of the entire portfolio. The LAMC will be responsible for the difference, if the net return is below 5%.**

18. **Portfolio Owner agrees that it has been initial funds for the acquisition of portfolio for profits from the end of first round of portfolio when was March 25, 2012 to the end of second round of portfolio when is March 25, 2014.**

19. Early termination when funds are utilized for the initial portfolio, LAMC will charge an early termination fee equivalent to 10% of the acquisition purchase price of the remaining portfolio(s).

20. Portfolio Owner and Liberty will execute specific escrow instructions outlining distribution structure after all property fees are deducted for each property on an individual transactional basis. Prior to Grant Deed being executed by appointed Portfolio Owner or LAMC if Portfolio Owner chooses to appoint LAMC signature authority. Escrow instructions with distribution of the net proceeds for each property of the entire portfolio will be provided and signed by both parties along with this agreement.

20. Portfolio Owner understands that after execution of this agreement LAMC will pursue a distressed asset portfolio to be purchased by Portfolio Owner that LAMC will assist in the acquisition and will manage the portfolio through the disposition stages until all assets are liquidated and will continue the process for 24 months utilizing funds provided by Portfolio Owner.


Liberty Asset Management Corporation                          Portfolio Owner:  JD Brothers, LLC

                                              7-21-13                                        7-21-13

Asset Manager                    Date              Wei Huang, JD Brothers LLC's         Date
                                                   Power Attorney in fact

